[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**1:21-CV-00560**

AJS

**RECEIVED**

2/1/2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT



### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

Varil A. Massey Jr.
# R-72867

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

SCANNED AT STATEVILLE CC and E-mailed
2-1-21 by CK 65 pages
date        initials    No.

**JUDGE FEINERMAN**
**MAGISTRATE JUDGE HARJANI**
**PC3**

vs.

Marcus Hardy,
Quentin Tanner,
E. Aguinaldo, and
David Gomez

_____

(Enter above the full name of ALL
defendants in this action. **Do not**
**use "et al."**)

Case No: _____
(To be supplied by the Clerk of this Court)

**CHECK ONE ONLY:**

___X___  **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983**
**U.S. Code** (state, county, or municipal defendants)

_____  **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE**
**28 SECTION 1331 U.S. Code** (federal defendants)

_____  **OTHER** (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR*
*FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

I.   **Plaintiff(s):**

A.   Name: ___Yarii A. Massey Jr.___

B.   List all aliases: ___None___

C.   Prisoner identification number: ___R-72867___

D.   Place of present confinement: ___Stateville C.C.___

E.   Address: ___Stateville C.C., POB 112, Joliet, IL 60434 (Mailing address)___

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II.  **Defendant(s):**

(In A below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in B and C.)

A.   Defendant: ___Marcus Hardy___

Title: ___deputy dir. - IDOC___

Place of Employment: ___Springfield, IL___

B.   Defendant: ___Quentin Tanner___

Title: ___dietary supv.___

Place of Employment: ___Stateville C.C.___

C.   Defendant: ___E. Aguinaldo Jr.___

Title: ___medical doctor___

Place of Employment: ___Stateville C.C.___

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

D. Defendant: David Gomez

Title: Warden

Place of Employment: Stateville C.C.

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

III.   **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A.   Name of case and docket number: _Due Process_
_Massey V. Melvin 1:17-CV-01430-CSB_

B.   Approximate date of filing lawsuit: _9/25/17_

C.   List all plaintiffs (if you had co-plaintiffs), including any aliases: _Varii_
_a. Massey_

D.   List all defendants: _Michael P. Melvin_

E.   Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _U.S. District Court Central District of IL._

F.   Name of judge to whom case was assigned: _Judge Colin Stirling_
_Bruce_

G.   Basic claim made: _Due Process_

H.   Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _Dismissed_

I.   Approximate date of disposition: _4-22-2019_

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

3

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

A1. Name of case and docket Number Massey V. The state of Illinois 20CC0157.

B1. Approximate date of filing lawsuit July, 29, 2019

C1. List all Plaintiffs (if you had co-Plaintiffs), including any aliases: Yarii A. Massey Jr.

D1. List all defendants: ~~whiteout~~ the State of IL and the IL Department of Corrections.

E1. Court in which the lawsuit was filed (if federal court name the district; if State court name the County): State of IL court of claims will County.

F1. Name of Judge to whom case was assigned: Commissoner Jacksock Laura.

G1. Basic claim made: Conversion.

H1. Disposition of this case (for example: was the case dismissed? was it Appealed? is it still Pending?): Conversion still pending.

I1. Approximate date of disposition still Pending.

## IV. Statement of Claim:

State here as briefly as possible the facts of your case. Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

Count #1 - 42 U.S.C. 1983, Eighth Amend., failure to provide Yarii A. Massey Jr. with humane living conditions

1. Since Dec. 14, '16, Plaintiff Yarii A. Massey Jr (hereafter "Massey") has been incarcerated at Stateville C.C.

2. Since Massey's incarceration and continuing to the present, he is housed in grim living conditions that include: substandard heating, cooling, and ventilation, infestation of cockroaches, mice, and other pests, rabid groundhogs and skunks which are widespread throughout the facility causing unbearable stench, Cell(s) that are filled with dust mites, dirt, spiderwebs, bird feces, poor sanitation due in part to malfunctioning toilets and plumbing, showers that are saturated with black mold, roaches, peeling

- 4 -

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

lead based paint, and decaying ceilings/walls, brown and foul-smelling water that is not fit for human consumption that Massey is required to bathe and drink, broken and non-functioning windows, and a physical plant that is overall dilapidated and known to the defendants herein. (Lester Dobbey v. Michael Studer, et al., case no. 13 C 1068) [1]

3. There is no air-conditioning in hot weather, window handles have been removed, precluding windows from being opened to allow fresh air to enter, most windows are replaced with glass block units causing heat to remain in the living unit, even when temperatures exceed 80° for prolonged periods of time. The resulting oppressive conditions make it difficult for Massey to breathe, and nearly impossible to sleep. (See Ex. A, pictures of glass blocks, etc.)

FN

1. An action in the Northern District against Stateville C.C. wherein Stateville acknowledges and agrees to remedy most of said defects; one of several (class action) actions.

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

4. Heating is unreliable and windows are either missing, and the missing windows are covered with a plastic covering or broken causing Massey to have to endure temperatures below 50° for prolonged periods of time; causing Massey undue hardships and the inability to sleep or function due to the cold.

5. The above-conditions are compounded due to the cell that Massey is currently housed in is inhumane. (cell E925) The cell is with a continuous infestation of cockroaches/ mice, and bird droppings; and dust mites. The roaches are so widespread that they cover Massey during his sleep, have entered his mouth, nose, and ear, WHICH HAS CAUSED MASSEY A LOSS OF HEARING IN HIS RIGHT EAR. A futher consequence is preventing Massey from sleeping more than a few hours each day; night. And often prevents him from closing his eyes for fear that roaches will invade his body. Thomas v. Illinois, 697 F.3d 612 (7th cir. 2012) (The 7th cir. holds that cockroaches can transmit bacteria ... and cause other disease) ( See Ex. B, roaches-hazards, and can cause hearing loss)

6. More, Massey's cell is saturated with dust mites, Spiderwebs, and bird droppings. Birds live inside the living units, bird nests are many. The birds fly around day/night laying droppings and entering cells. The cell(s) is with layers of lead based paint. Mice are rampant throughout the cell. Massey is not provided any cleaning tools-reasonable – i.e., mop, broom, etc., or any usable cleaning toxins. (See Ex. C and D respectively, the hazards of dust mites and bird droppings) (See Ex. E, the hazards of lead exposure)

7. The showers are saturated with black mold that lays on the ceiling walls, etc., the showers are inundated with roaches, filth, dirt, and garbage, the shower(s) ceilings, walls are deteriorating, the shower(s) ventilation fans are caked with dust, dirt, insects, etc. and often does not work. (See Ex. F and G respectively, pictures of shower(s) and the hazards of black mold)

8. Large fans are employed from time to time to circulate air in the common area of the facility. The blades of the fans are caked with dust mold and bird feces that spew these particles into the air causing Massey respiratory problems, i.e, making it difficult for Massey to breathe, sleep, or eat.

9. The water Massey is required to drink and bathe in contains brown rust of varying intensity and is believed to contain above-standard levels of radium. The facilities personnel are advised not to drink or otherwise utilize the water, because consumption raises health risks.

10. Food trays (food is placed directly on the tray) are often filthy containing food particles from prior use, often trays are with bird feces / droppings from birds that fly freely in the dining area while Massey eats. Food preparers often work without gloves or hairnets in food preparation areas. The preperation area is strewn with dead cockroaches and other bugs. Food which is to be served at hot temperatures are served cold, and vice versa, exposing Massey to food borne illness, Massey often feels sick after eating.

11. Defendant Tanner has/is failed (ing) to comply with Illinois Dept. Public Health Food service and Sanitation Rules and Regulations. 77 Ill. Adm. Code 750. / 730 ILCS 5/3-2-2 and 410 ILCS 620/1 et seq (See Ex. H, rules/regulations regarding food service)

12. Massey has had the opportunity to discuss the above-said conditions with defendants Tanner, Gomez, Hardy, and others, however, these defendants consciously and deliberately ignore Massey's request to address or mitigate said conditions. These conditions are open and obvious to each of these defendants. Correction officials violate the eighth amend. when they show deliberate indifference to adverse conditions that deny the minimum civilized measure of lifes necessities. Budd v. Motley, 711 F.3d 840, 842 (7th Cir '13)

Count #2 - U.S.C. 1983, eighth amend, deliberate indifference to Massey's hearing impairment and damages caused by a direct result of Stateville's inhumane living conditions

13. Massey realleges and incorporates paragraph 5 as if fully stated herein - "cockroaches". Massey, daily has to fend off roaches while in his cell. He has made complaints, spoken to prison officials, etc. as an attempt to protect himself from harm, but to no avail, as said above.

14. On about Dec. 06, 19, Massey began complaining that his right ear was/is "ringing", throbbing, etc. Consequently, on Dec. 14, '19, Massey was evaluated by Nurse Tiffany. Tiffany observed a mass inside Masseys ear and flushed the same.

15. During the flush of Masseys ear, Tiffany/Massey observed two roaches from the flush of Massey's ear. Nurse Tina observed the same and loudly joked to Prentiss Smith (inmate) that in a year Prentiss would have the same in his ear. (See Ex I, affidavit of Smith)

16. Even after the roaches were removed from Massey's ear, the ringing / throbbing continued in Massey's ear. Massey continued to inform medical of the same. Consequently, on about Dec 20, 19, Massey was evaluated by Nurse Cara, who informed Massey that if this continuing problem persists to resubmit to medical - a request to be seen. Massey, also explained to Cara, Massey realleges and incorporates par's 13 to 15 as if fully stated herein.

17. About Dec 23, 19, Massey was seen by Dr. Aguinaldo for another medical issue, however, Massey urged Aguinaldo to examine his ear because of the pain / discomfort he was enduring. Massey also explained to Aguinaldo, Massey realleges and incorporates par's 13 to 16 as if fully alleged herein. Massey also informed Aguinaldo that hearing from his right ear was impeded.

18. Aguinaldo, examined Massey's ear(s) and discovered abnormalities in color / conditioning, etc. Aguinaldo asserted that he would refer Massey to be seen by a hearing specialist, but to no avail - approx. four months has passed and Massey is completely without hearing in his right ear, and has not been seen by a specialist, or supplied with a hearing aid / device.

19. Moreover, medical personnel, on information and belief with training with hearing testing has determined that Massey has complete hearing loss in his right ear. This loss is effecting Masseys ability to function normally, i.e., hear guards, watch tv, listen to the radio, talk on the phone, etc. Massey is with a constitutional right to be provided with a hearing aid, etc. Ruiz v. Estelle, 503 F. supp 1265, 1340 (S.D. Tex '80); 42 U.S.C. S.S. 12101 et seq. This proposition applies to all states, including Illinois under the Americans with Disabilities Act (ADA), 42 U.S.C. S.S. 12101 et seq

## Grievance Procedure

20. Massey has exhausted his administrative remedies. In summary, in Sept '19, Massey submitted a grievance about this as (living conditions) on emergency grievance and subsequently forwarded the same to the "ARB". However, the ARB, returned the same directing Massey to file the grievance by normal process. But once Massey files an emergency grievance and forward the same to the ARB, exhaustion of remedies is complete. Thornton v. Snyder, 428 F.3d 690 (7th cir) But Massey, to receive a response from Stateville refiled the grievance in Dec. 2019, but Stateville refuses to answer the same, so Massey again sent the same to the ARB. Johnson v. Rivera, 272 F.3d 519, 521-522 (7th cir) See (Ex. G1, 2, 3, 4, 5, and 6.)

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## V.    Relief:

State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.

Massey respectfully moves this Honorable court to award him compensatory, nominal, and Punitive damages in an amount to be determined at trial, The cost of filing this Petition (filing fee) and any other amount that this Courts deems just and fair.

## VI.    The plaintiff demands that the case be tried by a jury.    ☒ YES    ☐ NO

### CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief.  I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this 12ᵗʰ day of January, 2021

_____
(Signature of plaintiff or plaintiffs)

(Print name) Varii A. Massey Jr.

(I.D. Number) R-72867

(Address) Stateville CC. P.O.Box 12 Joliet IL 60434

6

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 04/21/2017



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

PRIVILEGED & CONFIDENTIAL

Quarter Houses - Page 7
WJE 2018.6172
10/30/2019

- Floors – **Repair uneven floor and stair conditions.**
  - Concrete floors have a finish material that is bulging at localized conditions, which represents a safety concern. Investigate the cause of this condition and make appropriate repairs.
  - Concrete finish on steel stairs is cracked and spalled at localized conditions, which represents a safety concern.






ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

PRIVILEGED & CONFIDENTIAL

Quarter Houses - Page 6
WJE 2018.6172
10/30/2019

- **Showers – Rebuild shower ceilings.**
  - Two ground floor shower rooms have plaster finish ceilings on wood support framing. The wood framing has wood decay observed at open vantage points. These two ceilings should be rebuilt with a more durable ceiling framing material than wood for a shower room environment.
  - The plaster finish ceilings for the shower rooms on upper floor levels have indeterminate support framing. In one of these shower rooms, a portion of the plaster finish reportedly fell. These shower rooms should have the plaster finish removed to determine the condition of the ceiling support framing and to repair deficiencies.






WJE | ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

PRIVILEGED & CONFIDENTIAL

Quarter Houses - Page 4
WJE 2018.6172
10/30/2019

- Windows — **Replace broken glass.**
    - Large windows are present between brick masonry piers. On one long elevation (northeast) the windows have broken glass at localized conditions. At the other long elevation (southwest), the windows have been replaced with glass block units and are in good condition.







PRIVILEGED & CONFIDENTIAL

Quarter Houses - Page 5
WJE 2018.6172
10/30/2019

- Roof – **Perform scheduled roofing repair project.**
    - The sloped roof includes a gypsum plank deck supporting corrugated fiber cement roofing panels. The roof drains to built-in gutters covered with a modified bitumen membrane. The bottom rows of gypsum plank are water stained and water damaged. The damage may be related to ice damming.
    - The modified bitumen roofing in the built-in-gutters is wrinkled and blistered with open seams.
    - Metal parapet copings are displaced at localized locations.



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

PRIVILEGED & CONFIDENTIAL

X-House Page 3
WJE 2018.6172
10/30/2019

- **Shower Rooms - Repair deteriorated ceiling/walls and broken glass in skylight.**
    - The plaster ceiling is deteriorated and loose at localized conditions and should be repaired. Wall finishes are deteriorated at localized conditions and should be repaired.
    - One shower room has a skylight above with broken glass. Remove all broken glass and restore with weather-tight materials.








ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

PRIVILEGED & CONFIDENTIAL

X-House Page 2
WJE 2018.6172
10/30/2019

- Glass Windows - **Replace broken glass.**
  - Single pane glass in steel sash windows are frequently cracked and/or missing.

- Roof - **Repair roofing at localized skylight conditions.**
  - The roof is covered by a ballasted EPDM membrane. At the parapet walls, the membrane was previously cut and repaired, likely to address shrinkage of the EPDM membrane. The membrane around the skylights was not repaired and shrinkage is pulling the membrane away from the skylights.





- Interior - **Repair or replace broken window hardware.**
    - Operable window sash at localized locations have broken hinge arms.



**END OF REPORT**



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

PRIVILEGED & CONFIDENTIAL

Quarter Houses - Page 1
WJE 2018.6172
10/30/2019

## QUARTER HOUSES

| IDXX Bldg. No. | General Function | Original Constr. Era | Approx. Size | General Roof Type | General Wall Type | Recorded Capital Improvement (date and CDB project if known) |
|---|---|---|---|---|---|---|
| CO221 | Housing and ancillary use | 1930 | 480' x 80' 6 stories | Sloped fiber cement roofing and modified bitumen membrane | Brick Masonry | • Roofing/Walls 1994 (CDB No.120-230-083)<br>• Windows 2002 (CDB No. 230-108)<br>• Roofing 2015* |

\* 2015 Roofing Project (CDB 120-230-128) was reportedly not yet done

## Claimed Issue

- The integrity of the roof and building structure due to possible water damage and/or risk of structural insecurities
- Evaluate the roof/ceiling in the shower units for any structural vulnerabilities.

unaffected by an acute burst of radiation, but lingering radioactive fallout would still be harmful.[52]

# Relationship with humans

## In research and education

Because of their ease of rearing and resilience, cockroaches have been used as insect models in the laboratory, particularly in the fields of neurobiology, reproductive physiology and social behavior.[31]



The cockroach is a convenient insect to study as it is large and simple to raise in a laboratory environment. This makes it suitable both for research and for school and undergraduate biology studies. It can be used in experiments on topics such as learning, sexual pheromones, spatial orientation, aggression, activity rhythms and the biological clock, and behavioral ecology.[58]

Cockroaches in research: *Periplaneta americana* in an electrophysiology experiment

Research conducted in 2014 suggests that humans fear cockroaches the most, even more than mosquitoes, due to an evolutionary aversion.[59]

## As pests

The Blattodea include some thirty species of cockroaches associated with humans; these species are atypical of the thousands of species in the order.[60] They feed on human and pet food and can leave an offensive odor.[31] They can passively transport pathogenic microbes on their body surfaces, particularly in environments such as hospitals.[62][63] Cockroaches are linked with allergic reactions in humans.[64][65] One of the proteins that trigger allergic reactions is tropomyosin.[66] These allergens are also linked with asthma.[67] About 60% of asthma patients in Chicago are also sensitive to cockroach allergens. Studies similar to this have been done globally and all the results are similar. Cockroaches can live for a few days up to a month without food, so just because no cockroaches are visible in a home does not mean they are not there. Approximately 20-48% of homes with no visible sign of cockroaches have detectable cockroach allergens in dust.[68]

Cockroaches can burrow into human ears, causing pain and hearing loss.[69][70] They may be removed with forceps, possibly after first drowning with olive oil.[71][72][73]

### Control

Many remedies have been tried in the search for control of the major pest species of cockroaches, which are resilient and fast-breeding. Household chemicals like sodium bicarbonate (baking soda) have been suggested, without evidence for their effectiveness.[74] Garden herbs including bay, catnip, mint, cucumber, and garlic have been proposed as repellents.[75] Poisoned bait containing hydramethylnon or fipronil, and boric acid powder is effective on adults.[76] Baits with egg killers are also quite effective at reducing the cockroach population. Alternatively, insecticides containing deltamethrin or pyrethrin are very effective.[76] In Singapore and Malaysia, taxi drivers use pandan leaves to repel cockroaches in their vehicles.[77]

Few parasites and predators are effective for biological control of cockroaches. Parasitoidal wasps such as *Ampulex* wasps sting nerve ganglia in the cockroach's thorax, temporarily paralyzing the victim, allowing the wasp to deliver a second sting into the cockroach's brain. The wasp clips the antennae with its mandibles and drinks some hemolymph before dragging the prey to a burrow, where an egg is laid on it. The wasp lays a few on the adult body.



Ex. C



### Environment, Health and Safety

**Online**

*The site for free, objective information you can use!*

Email this page    Table of contents    Feedback Acronyms Services    Search the site

# Dust Mites: Everything You Might Not Want To Know!



Just thinking of these dust mites living in your pillow by the millions, eating your dead skin and hair is enough to make even Gov. Arnold Schwartznegger sick. The are a major cause of asthma and allergies; especially in vulnerable individuals, such as children and the elderly. According to the American College of Asthma, Allergy & Immunology, approximately 10 percent of Americans exhibit allergic sensitivity to dust mites. In the spring, pollen aggravates allergies, and dustmite infestations make it worse. The Fall and Winter months are a particular problem, as we close up our houses and the concentrations of dust mites and their feces increases inside. And with dustmites at their multiplying peak during warm, wet weather, read on to find out what you can do about dust mites!

The protein substances in the dust mite feces produces antibodies in humans who are allergic when these are inhaled or touch the skin. These antibodies cause the release of histamines which causes to nasal congestion, swelling and irritation of the upper respiratory passages. The Mayo Clinic, WebMD and NIH collectively provide this list of typical symptoms of an allergy to dust mites; You may experience all or just some of them:

- Hay fever,
- Watering eyes,
- Runny nose,
- Sneezing,
- Asthma; difficulty in breathing,
- Infantile eczema 0000000
- Itchy, red or watery eyes
- Nasal congestion
- Itchy nose, roof of mouth or throat
- Postnasal drip
- Cough
- Facial pressure and pain
- Frequent awakening
- Swollen, blue-colored skin under your eyes
- In a child, frequent upward rubbing of the nose

A doctor can use skin tests and blood tests to confirm a suspected dust mite allergy.

Since dust mites are present all year round, the symptoms of the allergy can be present at any time of the year, but are worst, in months and seasons when the house is closed and the indoor humidity and temperatures are high (which, depending upon the household's use of heating and air conditioning, can be any time of the year). The dried dust mite feces becomes airborne when someone walks over a rug, sits down in a chair, or shakes the bed clothes, making allergic person's symptoms worse.

## What else makes the symptoms worse?

- Poor ventilation
- High humidity
- High temperatures (above 70 F / 20 C)
- Indoor air pollution such as tobacco smoke or car fumes.

Formatted: Font: (Default) Arial, 12 pt, Font color: Black

## Identification

House dust mites, are too small to be visible to the naked eye; they are only

Formatted: Font: (Default) Arial, 12 pt, Font color: Black

250 to 300 microns in length and have translucent bodies. It takes at least a 10X magnification to be able to correctly identify them. The adult mite's cuticle (covering) has simple striations that can be seen from both the dorsal (top) view and from the ventral (bottom) view. The ventral view of the house dust mite reveals long setae (hairs) extending from the outer margins of the body and shorter setae on the rest of the body. Through the microscope, one will see many oval-shaped mites scuttling around and over one another. There are eight hairy legs, no eyes, no antennae, a mouthpart group in front of the body (resembles head) and a tough, translucent shell, giving a "fearsome appearance."

Formatted: Font: (Default) Arial, 12 pt, Font color: Black

Formatted: Font: (Default) Arial, 18 pt, Bold, Font color: Black

## Biology and Life Cycle



Adult females lay up to 40 to 80 eggs singly or in small groups of three to five. After eggs hatch, a six-legged larva emerges. After the first molt, an eight-legged nymph appears. After two nymphal stages occur, an eight-legged adult emerges. The life cycle from egg to adult is about one month with the adult living an additional one to three months.

The diet is varied with the primary food source, consisting of dander (skin scales) from humans and animals. However, needed nutrients can be provided from fish food flakes, pet food, fungi, cereals, crumbs, etc. Many mite species live in bird's nests, in barns, among stored grain, straw, etc.

House dust mites are cosmopolitan in distribution with much of the research previously done in Europe.

One of the major limiting factors in mite survival and population development is the availability of water for sorption. Highest mite densities occur in the humid summer months and lowest in drier winter periods. Dust mite populations are highest in humid regions and lowest in areas of high altitude and/or dry climates.

Due to the large quantity of skin scales sloughed off daily by humans, mites have an abundant food supply. Dust mite antigen levels are measured in bed dust, floor dust, and room air samples. Detection in room air was best during cleaning and



# Public Employees Occupational Safety and Health Program

Division of Epidemiology, Environmental and Occupational Health

Christine Todd Whitman    Christine M. Grant, JD, MBA    April 2000

# Control of Health Hazards Associated with Bird and Bat Droppings

**Special points of interest:**

- Disease Association
- Recognition
- Evaluation
- Hazard Control
- Recommendations
- Further Information

## Health Risks

Large populations of roosting birds may present a disease risk. The most serious health risks arise from disease organisms that grow in the nutrient-rich accumulations of bird droppings, feathers and debris under a roost — particularly if roosts have been active for years. In addition, insects that live on birds or their droppings may become a problem when the infested birds leave roosts or nests. These insects can invade buildings and bite or irritate people.

This bulletin discusses the health risks and control of the risk of several of the fungal diseases associated with bird and bat droppings and methods of controlling these risks.



The PEOSH Program has evaluated several work sites where employees were concerned about health hazards from accumulated pigeon droppings. The common denominator in these PEOSH investigations has been the presence of roosting pigeons in an undisturbed



location. In one New Jersey worksite, accumulated manure was found in a stair well leading to the basement. Local newspapers reported that a city hall building was "taken over" by pigeons that had deposited several inches of manure on the window ledges. At a bridge commission, employees complained to the PEOSH Program that their booths were covered in pigeon droppings. Maintenance engineers at a university campus were concerned about bird droppings near a ventilation system located on the roof of one of the buildings. Furthermore, several building attics were evaluated because of employee concerns with bird manure accumulations.

Get the Facts about Ebola



## Lead Poisoning: Signs & Symptoms

Children

Adults



#### How can I tell if my child has been exposed to lead?

Signs of lead poisoning are not always easy to see. Children can be poisoned by lead and may not look or act sick. Many children who are lead-poisoned look and act healthy. Sometimes the vague symptoms may be mistaken for other illnesses such as upset stomach or flu. Because of this, lead poisoning may go unrecognized.

Your health care provider will ask you some questions to see if your child is at risk for lead poisoning. The only way to know for sure if your child has been exposed to lead is to have their blood tested. Blood tests are used to find out how much lead is in a child's blood. The test is simple. Your health care provider takes blood from your child and a lab will test the blood.

Some possible signs and symptoms of lead poisoning in children are:

Tiredness or loss of energy

Hyperactivity

Irritability or crankiness

Reduced attention span

Poor appetite

Weight loss

Reduced attention span

Trouble sleeping

Constipation

Aches or pains in stomach

#### How can lead poisoning affect my child?

Children can get lead in their bodies by swallowing or breathing in dust that contains lead. Lead is a poison that affects every organ and system in the body. There is not function or need for lead. Very high levels of lead exposure can cause coma, seizures and death. Even a little lead can make children slower learners. Other health effects include:

Brain damage and lower intelligence

Behavior and learning problems

Hyperactivity

Impaired speech and language

Slowed growth

Kidney and liver damage

Hearing damage

The effects of lead on a child can be permanent and irreversible.

#### What are the symptoms of lead poisoning in adults?

People with high levels of lead in their bodies often do not seem sick. The symptoms that occur are very general and can happen for many reasons. Overexposure to lead can cause serious damage even if the person has no symptoms. A blood lead test is the only way to find out if an adult has lead poisoning. Lead is a powerful poison that stays in your body a long time. It can build up in your body to dangerous levels even if you are exposed only to small amounts of lead over a long period. An elevated blood lead level shows that lead is building up in your body faster than it can be eliminated.

Signs or symptoms that may be related to over-exposure to lead are:

Tiredness or weakness

Irritability

Trouble sleeping

Headache

Difficulty concentrating

Aches or pains in stomach

Loss of appetite

Constipation

Nausea

Weight loss

**How does lead affect adults?**

Impotency

Brain and nervous system damage

High blood pressure

Digestive problems

Kidney problems

Anemia

Reproductive system problems

Hearing, vision and muscle coordination problems



Ex. F

# Lead Exposure in Adults - A Guide for Health Care Providers

- "Lead Exposure in Adults - A Guide for Health Care Providers" is available in Portable Document Format (PDF, 146KB, 12pg.)

## How Are Adults Exposed to Lead?

Lead exposure occurs when lead dust or fumes are inhaled, or when lead is ingested via contaminated hands, food, water, cigarettes or clothing. Lead entering the respiratory and digestive systems is released to the blood and distributed throughout the body. More than 90% of the total body burden of lead is accumulated in the bones, where it is stored. Lead in bones may be released into the blood, re-exposing organ systems long after the original exposure.

## What are the Adverse Health Effects that Lead Exposure Can Have on Adults?

The toxic nature of lead is well documented. Lead affects all organs and functions of the body to varying degrees. The frequency and severity of symptoms among exposed individuals depends upon the amount of exposure. The list below shows many of the key lead-induced health effects.

Neurological Effects
- Peripheral neuropathy
- Fatigue / Irritability
- Impaired concentration
- Hearing loss
- Wrist / Foot drop
- Seizures
- Encephalopathy

Gastrointestinal Effects
- Nausea
- Dyspepsia
- Constipation
- Colic
- Lead line on gingival tissue

Reproductive Effects
- Miscarriages/Stillbirths
- Reduced sperm count & motility
- Abnormal sperm

Heme Synthesis
- Anemia
- Erythrocyte protoporphyrin elevation

Renal Effects
- Chronic nephropathy with proximal tubular damage
- Hypertension

Other
- Arthralgia
- Myalgia

## What Lead Levels are Considered Elevated in Adults?

- At levels above 80 µg/dL, serious, permanent health damage may occur (extremely dangerous).
- Between 40 and 80 µg/dL, serious health damage may be occuring, even if there are no symptoms (seriously elevated).

- Between 25 and 40 µg/dL, regular exposure is occuring. There is some evidence of potential physiologic problems (elevated).
- Between 10 and 25 µg/dL, lead is building up in the body and some exposure is occuring.

The typical level for U.S. adults is less than 10 µg/dL (mean = 3 µg/dL).

## What is the Health Care Provider's Role?

- All health care providers should be aware of the Occupational Safety and Health Administration (OSHA) General Industry Lead Standard (29CFR1910.1025) and the Construction Lead Standard (29CFR1926.62). Providers who are in a contractual arrangement with an employer should know their responsibilities to the employer and workers.
- NYS law requires all laboratories to report all blood lead levels to the New York State Department of Health. The health care provider should assure that all of the information required by the laboratory is completed for all blood lead analyses ordered and that this information accompanies the sample to the testing laboratory.
- If lead exposure is suspected, the patient's medical evaluation should include:
  - An occupational and environmental history with attention to possible lead exposure. **There are certain jobs, hobbies, foods and folk medicines that are more likely to be associated with lead. These should alert the Health Care Provider to the possibility of lead exposure.**
  - Laboratory testing for blood lead and ZPP levels
  - If the laboratory tests are elevated, then a comprehensive physical exam that includes laboratory testing for:
    - hemoglobin, hematocrit, red blood cell indices
    - examination of peripheral smear morphology, BUN and serum creatinine
    - routine urinalysis with microscopic examination
    - pregnancy or male fertility, if requested by employee
- Ongoing Biological Monitoring for Exposure

Blood lead levels can rise quickly. With frequent monitoring of blood lead levels, dangerous exposures can be quickly identified and corrected, workers can be protected, and the need for OSHA mandated medical removal of workers can be avoided. A blood lead level over 25 µg/dL shows that substantial exposure to lead is occurring. There is also increasing evidence that health effects may occur at this blood lead level.

Based on this information, the New York State Department of Health encourages employers to consider more frequent testing than required by OSHA, and the tracking of blood lead levels over time to identify trends. The following guidelines for testing were developed with the New York State Occupational Health Clinic Network. These occupational health clinics provide state of the art diagnostic and treatment services to New York State workers with occupationally related disease. The guidelines meet the OSHA standards and provide more information to the employer and employees to help control dangerous exposures.

## Voluntary Guidelines for the Control of Lead in the Workplace*

- First, test each worker before they begin any work involving lead
- Then test that worker every month:
  - For the first 3 months of testing, and
  - Whenever the previous blood lead level was greater than 25 µg/dL (If the previous blood lead level was at least 50 µg/dL, a follow-up test within 2 weeks and medical removal is required), or
  - Whenever an increase of at least 10 µg/dL from the previous test is observed
- After the first three months, continue testing every 2 months:
  - When the blood lead levels have remained below 25 µg/dL for 3 months, and
  - If an increase less than 10 µg/dL from the previous test is observed
- Test every 6 months:
  - When the blood lead levels remain below 25 µg/dL for 6 months, and
  - If an increase less than 10 µg/dL from the previous test is observed

Results of each test should be provided to the worker. Graphing the test results can help the employer and the worker identify whether blood lead levels are dropping, remaining stable or increasing. The employer should also review the test results for all workers to help identify jobs where problems may be occurring.

*These guidelines exceed OSHA requirements for medical monitoring.*

*If you see a case of lead poisoning or overexposure, there may be more nearby! Find out if there are other adults or children who are being exposed at work or at home.*



## What Are the Treatment Issues To Be Considered For Adults?

When lead poisoning has been diagnosed, the first course of action is to discontinue exposure. Whether discontinuation of exposure is sufficient to treat the poisoning depends on the blood lead level, severity of clinical symptoms, biochemical and hematologic disturbances, and the nature and history of exposure. All of these factors must be considered in determining the necessity for chelation therapy and there is no exact blood lead concentration above which treatment with a chelating agent is always indicated. In most cases, however, when a blood lead level rises to 80 μg/dL, chelation should be considered, especially in the presence of more severe signs and symptoms. Therapeutic chelating agents have potentially adverse side effects and should be used cautiously and on an individual basis. A single course of chelation may not sufficiently reduce blood lead levels and repeat courses may be required among heavily exposed individuals.

*Remember: The exposure must first be discontinued before initiating chelation therapy.*

## What is "Take Home" Lead?

Lead particles or dust can be brought into the home and family vehicle on work clothes and equipment. This is called "take home" lead and it can harm anyone who is exposed.

Since blood borne lead crosses the placenta, a pregnant woman with an elevated blood lead level may expose her fetus to the toxic effects of lead. All women should receive guidance on preventing lead poisoning before and during pregnancy.

Lead poisoning in children is especially dangerous because it can cause learning problems and serious illness. **If young children** live in the home and a parent **works with lead,** they should be tested.

## What Are Some Sources of Lead Exposure?

- Occupational
  - Construction workers
  - Steel welders
  - Bridge reconstruction workers
  - Firing range instructors and cleaners
  - Painters
  - Remodelers and refinishers
  - Foundry workers
  - Scrap metal recyclers
  - Auto repairers
  - Cable splicers
- Hobbies
  - Casting bullets or fishing sinkers
  - Home remodeling
  - Target shooting at firing ranges
  - Lead soldering
  - Auto repair
  - Stained glass making
  - Glazed pottery making
- Substance Use
  - Some folk remedies
  - Some "Health Foods"
  - Moonshine whiskey
  - Ceramicware

## How Can Your Patients Reduce Their Exposure to Lead?

Tell your patients to:

- **Wash** their hands and face before they eat, drink or smoke.
- **Eat, drink and smoke only** in areas free of lead dust and fumes.

- **Wear** a clean, properly fitted respirator with HEPA filter in all areas that have lead dust or fumes. Shave to get the best fit.
- **Change** into different clothes and shoes before engaging in work with lead. Keep their street clothes and shoes in a clean place.
- **Shower** after working with lead before they go home.
- **Launder** their clothes separately from other family members' clothes.

## Where Can A Health Care Provider Get Further Information?

**New York State Department of Health.** The Health Department can provide guidance, information and technical assistance to you on many occupational health issues. Further information is also available on the treatment of children and women.

> *(800) 458-1158 extension 27900*

**U.S. Occupational Safety and Health Administration (OSHA).** If you feel that an employer does not adequately address a safety or health hazard, you have the right to request an inspection by OSHA. In filing a complaint, you can ask OSHA to withhold your identity from your employer.

> *Albany - (518) 464-4338*
> *Buffalo - (716) 551-3053*
> *Long Island - (516) 334-3344*
> *Manhattan - (212) 620-3200*
> *Syracuse - (315) 451-0808*
> *Tarrytown - (914) 524-7510*
> *Queens - (718) 279-9060*

Further information can be obtained from OSHA's website at www.OSHA.gov.

**New York State Department of Labor.** If you are treating a public employee (works for State, county or city offices), OSHA standards are enforced by the New York State Department of Labor Public Employee Safety and Health (PESH) program. These offices should be contacted if you would like to request a consultation to identify and correct specific hazards and to provide guidance in developing an effective safety and health program, or if you wish to file a complaint for public employees.

> *Albany - (518) 457-5508*
> *Binghamton - (607) 721-8211*
> *Buffalo - (716) 847-7133*
> *Garden City - (516) 485-4408*
> *New York City - (212) 775-3548*
> *Rochester - (716) 258-4570*
> *Syracuse - (315)479-3212*
> *Utica - (315)793-2258*
> *White Plains - (914) 997-9514*

**Occupational Health Clinic Network**

To locate an occupational health clinic in your area, click here: Occupational Health Clinic and Phone Numbers

## References:

- Hipkins KL, Materna BL, Kosnett MJ, Rogge JW, Cone JE. Medical Surveillance of the Lead Exposed Worker. AAOHN Journal 46(7): 330-339, 1998.
- Rempel D. The Lead-Exposed Worker. JAMA 262(4):532-534, 1989. US Department of Labor, OSHA. Lead in Construction. OSHA 3142, 1993.

Revised: March 2009

# Just How Dangerous Is Mold?

Posted on October 5, 2007 by Dan Buglio

During the fall months, mold often is a major component in making allergies unbearable. Fallen leaves provide an ideal food source, because they also will hold in moisture, which is the key element in mold growth. Beyond their ability to spark allergic reactions and asthma attacks, molds can cause many other health concerns ranging from temporary discomfort to long term, life-threatening diseases.

**Molds can be separated into three catagories:**

- **Opportunistic Pathogens** (a parasitic organism that does not cause harm to it's host)

- **Exclusive Saprotrophs** (an organism that only consumes non-living organic matter)

- **Aquatic Thermophiles** (organisms that require warm temperatures to survive)

Molds differ from plants because they do not use photosynthesis to produce their food– mold must find a source of nourishment. As it feeds on it's host, mold work to break down whatever surface it is attached to. For this reason, mold is beneficial to decaying processes, but when mold turns up in your house, it is important to address it immediately. Though the mold growing on the grout in your bathroom may seem innocuous, it's mere presence means that the only thing holeing you tile in place is being slowly dissinigrated.

Molds spread by tiny airborne spores, that act like tiny seeds and only need a tempid environment, moisture and a food source to germinate (which is why the avergage house is a perfect mold environment). Some mold will produce toxins called mycotoxins in order to inhibit the growth of competitive organisms. The problem with mycotoxins is that molds enjoy the same environments that people do, and because of this, the humans are exposed to more dangerous mycotoxins than they may realize.

It is nearly impossible to destroy mycotoxins– the digestive system cannot break them down and temperature treatments like heating them or freezing do not affect them. This is why mycotoxins are one of the primary causes of food-bourne illness. Another situation where mycotoxins are fairly common is office building and schools. In the 1990's, people first realized that mycotoxins caused organ failure, cancer and respiratory problems and several multi-million dollar law suits were awarded to those affected by mold.



**Certain mycotoxins are considered to be the most**

10

potent carcenogens in existance.

There are several ways in which mycotoxins affect the body:

1. Hyper sensitivity - (an allergic response to molds and spores)
2. Mycotoxicosis -- poisoning by food products contaminated by fungi
3. Mycetismus = the ingestion of preformed toxin (i.e. toadstool poisoning)
4. Infection (systemic) -- (also known as Mycotoxicosis)

Symptoms of Mycotoxins (people with mycotoxicosis will have recently experienced at least 8 of the symptoms from this list):

- Respiratory distress, coughing, sneezing, sinusitis
- Difficulty swallowing, choking, spitting up (vomiting) mucous
- Fibromyalgia
- Hypersensitivity pneumonitis
- Burning in the throat and lungs (similar to acid reflux and often misdiagnosed as such)
- Asthmatic signs; wheezing, shortness in breath, coughing, burning in lungs, etc.
- Irritable bowel syndrome, nausea, diarrhea, abdominal pains
- Bladder, liver, spleen, or kidney pain
- Dark urine
- Dirt-like taste in mouth, coated tongue
- Food allergies/leaky gut syndrome/altered immunity
- Memory loss; brain fog, slurred speech, sometimes leading to dementia
- Vision problems
- Swollen lymph nodes
- Large boils on neck (Often a sign of Anaphylaxis)
- Thyroid irregularities
- Headaches
- Anxiety/depression; heart palpitations -- confusion, PTSD
- Extreme blood pressure, cholesterol, or triglycerides irregularities
- Ringing in ears, balance problems, dizziness
- Chronic fatigue
- Intermittent face flushing; almost always systemic (Called the Mylar Flush)
- Numbness in face and limbs, intermittent twitching
- Night sweats and hot flashes (Especially around the head)
- Multiple chemical sensitivity
- Nose bleeds
- Bruising easily

- Rash or hives, formication, bloody lesions all over the skin (often systemic)
- Reproductive system; infertility, changes in menstrual cycles
- Sudden weight changes
- Cancer
- Hair loss
- Joint/muscle stiffness and pain
- Heart attack
- Seizures
- Inadvertent facial movements or extremity jerking
- Hypersensitivity when re-exposed to molds, which can lead to anaphylaxis
- Anaphylaxis upon re-exposure to mycotoxin producing molds
- Death, in extreme cases

For tips on mold clean up or precautions against getting mold, check out my post on methods of mold clean up. If have a flooded area in your house that has been submerged for more than 24 hours or moldy area larger than two square feet, call a mold remediation company (it could be dangerous to to-it-yourself in these two cases)!

Any case of mold that is covering an area larger than two square feet can be dangerous for your health– so please use caution.

12

ILLINOIS DEPARTMENT OF CORRECTIONS

## Administrative Review Board
## Return of Grievance or Correspondence

**Offender:** Massey _____ Yarii _____ _____ R72867
Last Name          First Name          MI      ID#

**Facility:** Stateville _____

☒ Grievance: Facility Grievance # (if applicable) _____ Dated: 12/24/2019 _____ or ☐ Correspondence: Dated: _____

Received: 3/3/2020 _____ Regarding: Conditions- grieves roach in his ear 12/23/2019 _____
        Date

The attached grievance or correspondence is being returned for the following reasons:

**Additional information required:**

☐ Provide your original written Offender's Grievance, DOC 0046, including the counselor's response, if applicable.

☐ Provide a copy of the Response to Offender's Grievance, DOC 0047, including the Grievance Officer's and Chief Administrative Officer's response, to appeal; if timely.

☐ Provide dates when incidents occurred.

☐ Unable to determine nature of grievance or correspondence; submit additional specific information. Please return the attached grievance or correspondence with the additional information requested to:
Administrative Review Board, Office of Inmate Issues, 1301 Concordia Court, Springfield, IL 62794-9277

**Misdirected:**

☐ Contact your correctional counselor or Field Services regarding this issue.

☐ Request restoration of Statutory Sentence Credits to Adjustment Committee. If the request is denied by the facility, utilize the offender grievance process outlined in Department Rule 504 for further consideration.

☐ Contact the Record Office with your request or to provide additional information.

☐ Personal property and medical issues are to be reviewed at your current facility prior to review by the Administrative Review Board.

☐ Address concerns in a letter to: Illinois Prisoner Review Board, 319 E. Madison St., Suite A, Springfield, IL 62706

**No further redress:**

☐ Award of Earned Discretionary Sentence Credit is a discretionary administrative decision; therefore, this issue will not be addressed further.

☐ Administrative transfer denials are discretionary administrative decisions; therefore, this issue will not be addressed further.

☒ Not submitted in the timeframe outlined in Department Rule 504; therefore, this issue will not be addressed further.

☐ Administrative Review Board received the appeal 30 days past date of Chief Administrative Officer's decision; therefore, this issue will not be addressed further.

☐ This office previously addressed this issue on _____
                              Date

☐ No justification provided for additional consideration.

**Other** (specify): Grievance is dated 12/24/19. There are no facility responses. Therefore making this past time frame. _____

Completed by: Amy Burle _____ _____ 3/5/2020
              Print Name          Signature          Date

Distribution:  Offender          *Printed on Recycled Paper*          DOC 0070 (Rev. 3/2018)
               Inmate Issues

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 12-24-2019 | Offender: (Please Print) Varii A. Massey Jr. | ID#: R-72867 |
|---|---|---|

| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C. |
|---|---|

**NATURE OF GRIEVANCE:**

☐ Personal Property  ☐ Mail Handling  ☐ Restoration of Good Time  ☐ ADA Disability Accommodation
☐ Staff Conduct  ☐ Dietary  ☐ Medical Treatment  ☐ HIPAA
☐ Transfer Denial by Facility  ☐ Transfer Denial by Transfer Coordinator  ☒ Other (specify): Living Conditions

☐ Disciplinary Report: _____  _____
                              Date of Report          Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): On 12-14-2019 I had a health care pass for 9:30
I went to the prison Hospital because my ear was ringing and
irritated I put in for in House sick call Friday Dec, 6, 2019
I seen the nurse Saterday I told her about my Ear irriation
She looked in my ear and told me that it was a little wax-ha and
gave me some ear drops and put me in to get my Ear looked at
for Dec, 14, 2019 the nurse (tiffany) looked into my ear She Stated
that it was something in my ear she put a cup up to my ear
because the item that was suppost to be used was missing so
Nurse Tiffany told me to hold the cup up to my ear

Relief Requested: I am asking asking for stateville to do something about my
living conditions within this facility.

Thank you.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_Varii A. Massey Jr._ _____  R72867 _____ 12, 24, 2019
            Offender's Signature                              ID#              Date

**RECEIVED**
MAR 0 3 2020

(Continue on reverse side if necessary)

| Counselor's Response (if applicable) | |
|---|---|
| Date Received: ___/___/___  ☐ Send directly to Grievance Officer | **ADMINISTRATIVE** ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |

Response: _____

_____

_____

_____

_____

_____  _____  ___/___/___
Print Counselor's Name          Counselor's Signature          Date of Response

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE (Continued)**

in the put water into my ear it was two roaches in my ear when she flushed out my ear. Nurse (Tina) over saw every thing in made a joke to a nother inmate (Tina said to inmate Prentiss Smith inmate number Y31397 that will be you in a year with roaches in your ear. I did not see if the Nurse Tiffany put in her Health care book that she flushed two roaches out my ear.

I saw a Nurse again on Thurdey because of my ear was irriting me and ringing this was 12/20/2019 the nurse (Carla) told me to put back in for sick call in 2 or 3 days If my ear is not better.

On the 23th of Dec. 2019 I saw (Dr. A) Because he had my file for a nother Issue I was having. He looked for my right ear and saw that it was red and a little irriated he ask how was my hearing since the roaches was flushed out my ear I told him my hearing was a little off since all of that took place he told me that he will put me in to see a ear Dorter If it do not get better in 10 days.

I put in a grievance on 9·20·2019 as a Emergency grievance. see grievance number 10898. It was stated not a Emergency I sent that Living conditions grievance to Springfield A.R.B. The A.R.B. sent the grievance back to me stating that I have to let the grievance go back through the grievance process I did so but I have not heard from that grievance since I re-filed it as told by the A.R.B.

I am puting in this Grievance because I have been Affected by my Living conditions at Stateville c.c. and I tried on more then one occasion to do something about my Living conditions before it Affected me.

Ex.G3

# State of Illinois - Department of Corrections

## Counseling Summary

| | | | |
|---|---|---|---|
| **IDOC #** | R72867 | **Counseling Date** | 01/13/20 08:02:08:463 |
| **Offender Name** | MASSEY, YARII A. | **Type** | Collateral |
| **Current Admit Date** | 08/07/2008 | **Method** | Other |
| **MSR Date** | 03/14/2084 | **Location** | STA GRIEVANCE OFFICER |
| **HSE/GAL/CELL** | E -09-25 | **Staff** | LEDFORD, KELLY, Office Coordinator |

RECEIPT OF GRIEVANCE ON __12-27-19___ CONCERNING LIVING CONDITIONS. THIS GRIEVANCE HAS BEEN ASSIGNED GRIEVANCE #11732 AND WAS FORWARDED TO THE COUNSELOR FOR REVIEW AND RESPONSE.



RECEIVED

MAR 0 3 2020

ADMINISTRATIVE
REVIEW BOARD

**Print Date** 1/13/2020

Ex. G4

Dear, A.R.B.

Hi, My Name is Varii A. Massey Jr. I am a inmate of Stateville C.C. I put in a Offender's Grievance at this Facility Above. On 12·24·2020. I received a Grievance # on 1/13/2020 See grievance Number 11732. I put this grievance in 60 Day ago an I still have not received a response to this grievance because this Facility time is up to respond. I send this grievance to the A.R.B. For a response.

Thank you.

/s/ Varii A. Massey Jr.

RECEIVED

MAR 0 3 2020

ADMINISTRATIVE
REVIEW BOARD

EX.G5

# State of Illinois - Department of Corrections

## Counseling Summary

| | | | |
|---|---|---|---|
| **IDOC #** | R72867 | **Counseling Date** | 08/21/20 11:12:04:577 |
| **Offender Name** | MASSEY, YARII A. | **Type** | Collateral |
| **Current Admit Date** | 08/07/2008 | **Method** | Grievance |
| **MSR Date** | 03/14/2084 | **Location** | STA  GRIEVANCE OFFICER |
| **HSE/GAL/CELL** | E -09-25 | **Staff** | LEIBY, SHANE, Correctional Officer |

RECEIPT OF GRIEVANCE ON ___8/20/2020_ CONCERNING CONDITIONS/STAFF__. THIS GRIEVANCE HAS BEEN ASSIGNED GRIEVANCE #11732 AND WILL BE REVIEWED AND RESPONDED TO BY THE GRIEVANCE OFFICER.

**Print Date**  8/21/2020

ILLINOIS DEPARTMENT OF CORRECTIONS

**OFFENDER'S GRIEVANCE**

| Date: 12-24-2019 | Offender: (Please Print) Varrii A. Massey Jr. | ID#: R-72867 |
|---|---|---|
| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C. | |

**NATURE OF GRIEVANCE:**

☐ Personal Property    ☐ Mail Handling    ☐ Restoration of Good Time    ☐ ADA Disability Accommodation

☐ Staff Conduct    ☐ Dietary    ☐ Medical Treatment    ☐ HIPAA

☐ Transfer Denial by Facility    ☐ Transfer Denial by Transfer Coordinator    ☑ Other (specify): _____

☐ Disciplinary Report: ____ / ____ / ____
            Date of Report        Facility where issued

RECEIVED
STATEVILLE C.C.
DEC 27 2019
GRIEVANCE DEPARTMENT

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.

Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.

Chief Administrative Officer, only if EMERGENCY grievance.

Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): On 12-14 2019 I had a Health Care pass for 9:30. I went to the prison hospital because my ear was ringing and irritated. I put in for in House Sick call Friday Dec 6 2019 I seen the nurse Saturday I told her about my Ear irriation She looked in my ear and told me that it was a little unckes and gave me some ear drops and put me in to get my Ear looked at For Dec 14, 2019 the nurse (tiffany) looked into my ear she stated that it was some thing in my ear she put a cup up to my ear because the item that was supose to be used was missing So Nurse Tiffany had me to hold the cup up to my ear

Relief Requested: I am asking for Stateville to do something about my _____ within this facility.      Thank you.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Varrii A. Massey Jr.      R-72867      12 , 24 , 2019
    (Offender's Signature)          ID#         Date

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: 01 / 03 / 2020    ☑ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: Every month the unit is sprayed for bugs. Grievant is advised to keep food items coveled and put away in oder to avoid unecessary infestations. Nurse Tina does not recall this incdent.

S. Leibly      [signature]      7, 27, 2020
Print Counselor's Name      Counselor's Signature      Date of Response

---

**EMERGENCY REVIEW**

Date Received: ____ / ____ / ____    Is this determined to be of an emergency nature?

☐ Yes; expedite emergency grievance

☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

_____      ____ / ____ / ____
Chief Administrative Officer's Signature      Date

Distribution: Master File; Offender      Page 1      DOC 0046 (8/2012)

Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE (Continued)**

in She put water into my ear it was two roaches in my
Ear when she flushed out my ear. Nurse (Tina) over saw every
thing in made a joke to a nother inmate (Tina said to Inmate
Prentiss Smith inmate number Y-31397 that will be you in a
year with roaches in your ear. I did not see if the nurse
Tiffany put in her Health care book that she flushed two
roaches out my ear.

I saw a nurse again on Thurday because of my ear was
erriating me and ringing this was 12/20/2019. The nurse (Sara)
told me to put back in for sick call in 2 or 3 days if my ear is not
better.

On the 25th of Dec. 2019 I saw (Dr. A) Because he had my file
for a nother issue I was having He looked in to my right Ear and
saw that it was red and a little irriated he ask how was my
hearing since the roaches was flushed out my ear. I told him my
hearing was a little off since all of that took place. he told me
that he will put me in to see a ear Dr for if it do not get
better in 10 days.

I put in a grievance on 9-20-2019 as a Emergency
grievance. see grievance number 10898. It was stated not a
Emergency. I sent that Living conditions grievance to
Springfield A.R.B. The A.R.B. sent the grievance back to me
stating that I have to let the grievance go back through the
grievance process I did so but I have not heard from that
grievance since I refiled it as told by the A.R.B.

I am putting in this Grievance because I have been
Affected by my Living conditions at stateville c.c. and I tried on
more then one Occasion to do something about my living conditions
before it Affected me.

gned Grievance #/Institution:

APR 14 2020

Housing Unit: _Edward_ Bed #: _925 10W Be_

| vl rec: | | ILLINOIS DEPARTMENT OF CORRECTIONS | | 2nd Lvl rec: |
|---|---|---|---|---|

**GRIEVANCE DEPARTMENT**

**Offender's Grievance**

e: _4/16_  Offender (please print): _Harry H. Massey Jr._   ID #: _R-72867_   Race (optional): _A NA_

sent Facility: _Stateville CC_   Facility where grievance issue occurred: _Stateville CC_

ure of grievance:

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Disciplinary Report
- [x] Mail Handling
- [ ] Dietary
- [x] Other (specify):
- [x] Medical Treatment
- [ ] HIPAA
- [ ] ADA Disability Accommodation
- [ ] Restoration of Sentence Credit

Other (specify): _Living Conditions_

_____Date of report_____              _____Facility where issued_____

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

plete: Attach a copy of any pertinent document (such as a Disciplinary Report, Search Record, etc.) and place in the designated ed receptacle marked "grievance":

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to review by the Administrative Review Board
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor
Chief Administrative Officer, only if EMERGENCY grievance
Mail to Administrative Review Board, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except medical and personal property issues, or issues not resolved by the Chief Administrative Officer.

mary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for person involved):

_I have been in this Condemn cell since late Nov. 2019 with_
_to Electricity, Rats, and roaches I have been telling C/o's that_
_of the Edward cell House and gallery C/o's, The cell House Lt's_
_and Sgts. work orders After work orders have been put in about_
_y living Conditions in this facility and in this cell 925 I have put in_
_grievance After grievance about my living Conditions in this facility_
_and this cell cell 925. It had been roaches Flushed out my Ear_

- [x] Continued on reverse

f Requested:

_I would like to receive better living Conditions in_
_Stateville that is not a violation of my 8th Amen rights._

_Thank you_

Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Check if this is NOT an emergency grievance.

_[signature] Jr._
Offender's Signature      ID#  _R72867_      Date  _3/10/2020_

(Continue on reverse side if necessary)

RECEIVED
JUN 5 2020
STATEVILLE C.C.
GRIEVANCE DEPARTMENT
BY:

nselor's Response (if applicable)   Date Received: _4/30/20_   [x] Send directly to Grievance Officer

Outside jurisdiction of this facility. Send to: Administrative Review Board, PO Box 19277, Springfield, IL 62794-9277

ponse:

_Counselor address Abcve issues with offender Grievdan total has_
_he would be able to move once the Covid-19 hold was up._
_Extermonator has been to the unit & Sprayed down the cell as_
_requested from Unit 6, 4. Lastly A work order is in process for_
_the Electrical issues in the Cell._

Assigned Grievance #/Institution: _____

Housing Unit: **Edward**   Bed #: **925 low Bed**

1st Lvl rec: _____

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**Offender's Grievance**

2nd Lvl rec: _____

(right ear) I lost hearing in my right ear. I have not received a
hearing aid. After stated by the nurse that did my hearing test.
there has not been a sign put over my cell to let edas and
others know there is a hearing Impaired person in this cell cell 925.
There has been Electricity spark coming out the Socket
in cell E-925 Black smoke clouds are coming out of the Sockets
at all time of the day.
   I told the c/o's that work the House and gallery. I also
told Lt's and Sgt's that work the Edward House, that it is water
Dropping on the Socket in the back of the wall. I know this
because cell 926 water was not working for some time back
in Nov. of 2019 they came out to fix cell 926 water that Day
my Electricity went out, and every time they come to turn
on the Electricity it go back off the same Day in sparks
come out the socket and Black Smoke come out it is water
hitting the socket, nobody is doing anything about it but leaving
me in a Condemned Rat's and Roach moths Infested cell.

Ex 68

E925

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**RESPONSE TO OFFENDER'S GRIEVANCE**

| Grievance Officer's Report | | |
|---|---|---|
| Date Received: 06/05/2020 | Date of Review: 07/02/2020 | Grievance # (optional): 910 |
| Offender: Yaril Massey | | ID#: R72867 |

**Nature of Grievance:**

Conditions - Repairs

**Facts Reviewed:**

Grievant claims on a grievance written on 4/14/2020 that sparks and smoke clouds have been coming out of the electrical outlet in his cell and his cell is overrun with roaches. Per grievant he has gone to healthcare to have roaches flushed out of his ear.

Per counselor Araba, counselor addressed the above issues with offender and told him he would be able to move once the COVID 19 hold was up. Exterminator has been to the unit and sprayed down the cell as requested from unit E Lt. Lastly a work order in process for the electrical issues in the the cell.

Grievance officer finds counselor answer to be appropriate. Per Chief Engineer office the electrical issue was fixed on 5/4/2020 and again on 6/16/2020. There are currently no open work orders for cell E925.

RECEIVED

JUL 1 7 2020

ADMINISTRATIVE
REVIEW BOARD

**Recommendation:**

Grievance is denied

| | |
|---|---|
| Amy Gomez | |
| Print Grievance Officer's Name | Grievance Officer's Signature |
| (Attach a copy of Offender's Grievance, including counselor's response if applicable) | |

| Chief Administrative Officer's Response | | |
|---|---|---|
| Date Received: 7-10-2020 | ☒ I concur ☐ I do not concur | ☐ Remand |

**Action Taken:**

| | |
|---|---|
| Chief Administrative Officer's Signature | 7-10-2020 |
| | Date |

| Offender's Appeal To The Director |
|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must, within 30 days after the date of the Chief Administrative Officer's decision, be received by the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response if applicable, and any pertinent documents.)

| | | |
|---|---|---|
| Offender's Signature | R72867 | 7-11-2020 |
| | ID# | Date |

Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS

*Ex 69*

## Administrative Review Board
## Return of Grievance or Correspondence

Offender: __MASSEY__      __YARII__      __R72867__
       Last Name         First Name     MI     ID#

Facility: __STATEVILLE__

☒ Grievance: Facility Grievance # (if applicable) __910__    Dated: __3/10/2020__    or ☐ Correspondence: Dated: _____

Received: __7/17/2020__    Regarding: __CONDITIONS OF CELL__
     Date

The attached grievance or correspondence is being returned for the following reasons:

**Additional information required:**

☐ Provide your original written Offender's Grievance, DOC 0046, including the counselor's response, if applicable.

☐ Provide a copy of the Response to Offender's Grievance, DOC 0047, including the Grievance Officer's and Chief Administrative Officer's response, to appeal; if timely.

☐ Provide dates when incidents occurred.

☐ Unable to determine nature of grievance or correspondence; submit additional specific information. Please return the attached grievance or correspondence with the additional information requested to:
Administrative Review Board, Office of Inmate Issues, 1301 Concordia Court, Springfield, IL 62794-9277

**Misdirected:**

☐ Contact your correctional counselor or Field Services regarding this issue.

☐ Request restoration of Statutory Sentence Credits to Adjustment Committee. If the request is denied by the facility, utilize the offender grievance process outlined in Department Rule 504 for further consideration.

☐ Contact the Record Office with your request or to provide additional information.

☐ Personal property and medical issues are to be reviewed at your current facility prior to review by the Administrative Review Board.

☐ Address concerns in a letter to: Illinois Prisoner Review Board, 319 E. Madison St., Suite A, Springfield, IL 62706

**No further redress:**

☐ Award of Earned Discretionary Sentence Credit is a discretionary administrative decision; therefore, this issue will not be addressed further.

☐ Administrative transfer denials are discretionary administrative decisions; therefore, this issue will not be addressed further.

☒ Not submitted in the timeframe outlined in Department Rule 504; therefore, this issue will not be addressed further.

☐ Administrative Review Board received the appeal 30 days past date of Chief Administrative Officer's decision; therefore, this issue will not be addressed further.

☐ This office previously addressed this issue on _____
                 Date

☐ No justification provided for additional consideration.

**Other** (specify): __NO DATE CITED IN THE WRITTEN GRV WITHIN THE 60 DAY TIMEFRAME FOR REVIEW.__

Completed by: __Sarah Johnson__           __12/30/20__
         Print Name               Signature       Date

| **Illinois** Department of **Corrections** | *ADMINISTRATIVE DIRECTIVE* | Number | 05.02.142 |
|---|---|---|---|
| | | Page | 1 of 8 |
| | | Effective | 2/1/2001 |

| Section | 05 | Operations |
|---|---|---|
| Subsection | 02 | Safety, Maintenance, and Sanitation |
| Subject | 142 | Food Service Sanitation and Safety |

I.   **POLICY**

A.   **Authority**

730 ILCS 5/3-2-2 and 410 ILCS 620/1 et seq.

Ill. Dept. of Public Health Food Service Sanitation Rules and Regulations, 77 Ill. Adm. Code 750

B.   **Policy Statement**

The Department shall ensure that all food served in a correctional facility or transition center be in sound condition free from spoilage and other contamination. Food shall be stored, prepared, and served under sanitary conditions.

II.   **PROCEDURE**

A.   **Purpose**

The purpose of this directive is to establish written procedures governing the responsibilities of food service staff in ensuring the soundness of food and maximizing the protection of food against contamination.

B.   **Applicability**

This directive is applicable to all food service operations under the administration of adult or juvenile facilities within the Department including those contracted.

C.   **Internal Audits**

An internal audit of this directive shall be conducted at least annually.

D.   **Designees**

Individuals specified in this directive may delegate stated responsibilities to another person or persons unless otherwise directed.

E.   **Definitions**

Food service manager – means the person in charge of the food service operations.

Potentially hazardous food - means any food that consists in whole or in part of milk or milk products, eggs, meat, poultry, fish, shellfish, edible crustacea, or other ingredients, in a form capable of supporting rapid and progressive growth of microorganisms.

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 2/1/2001 | Page 2 of 8 | Number 05.02.142 |
|---|---|---|---|

Ready-to-eat food – means food that is in a form that is edible without washing, cooking, or additional preparation and is reasonably expected to be consumed in that form. Examples include unpackaged potentially hazardous food that is cooked and held according to correct time and temperature requirements and raw, washed, cut, and whole fruits and vegetables.

F.    **General Provisions**

1.    All food service operations shall comply with the provisions of the latest edition of the Illinois Department of Public Health (IDPH) Food Service Sanitation Rules and Regulations. The food service manager shall retain a copy of the most recent edition of the IDPH Food Service Sanitation Code.

2.    An employee possessing IDPH Food Service Sanitation Manager (FSSM) certification shall supervise food service operations when:

a.    Potentially hazardous foods are prepared, reheated, or cooled;

b.    Potentially hazardous foods are prepared and held hot or cold for more than 12 hours before serving;

c.    Complex preparation of foods or hand contact with raw ingredients occurs for ready-to-eat foods; or

d.    When potentially hazardous foods are being served, except where Paragraph II.F.3. applies.

3.    The presence of a certified FSSM shall not be required during service of meals containing potentially hazardous food items under the following conditions.

a.    Self-serve food items commercially prepared and packaged, for example, from a vending machine.

b.    Meals not commercially prepared and packaged if meals are:

(1)    Prepared under the supervision of an employee with FSSM certification with no additional preparation in the absence of a certified employee;

(2)    Prepared and held at appropriate temperatures for fewer than 12 hours prior to service;

(3)    Protected against possible sources of contamination;

(4)    Not cooled or reheated; and

(5)    Self-serve or pre-packaged.

**NOTE:** Where an employee with FSSM certification is required but unable to be present during service of a meal containing potentially hazardous foods, facility personnel may consider a temporary meal adjustment.

| ADMINISTRATIVE DIRECTIVE | Effective | | Page | | Number | |
|---|---|---|---|---|---|---|
| | | 2/1/2001 | | 3 of 8 | | 05.02.142 |

4. All food service employees possessing IDPH FSSM certification shall maintain current certification. Compliance with IDPH recertification requirements shall occur prior to certificate expiration through:

    a. Successful completion of an IDPH-approved initial or refresher FSSM course;

    b. Completion of an IDPH-approved examination with a passing score of 75% or higher; or

    c. Successful completion of other training pre-approved by the IDPH.

    NOTE: The initial FSSM course shall be provided by an IDPH-licensed instructor.



5. All food service supervisors shall receive annual refresher training provided by the food service manager. The content and duration of the food service training shall be determined by the manager and be in accordance with in-service training requirements. Records of training shall be retained for at least one year.

6. Non-food service staff who engage in food preparation or service or who supervise inmate workers in food service preparation areas shall:

    a. Be certified in food service sanitation through the IDPH; or

    b. In lieu of IDPH certification, receive food service training provided by the food service manager or a food service supervisor.

        (1) Training shall occur within ten days of assignment.

        (2) The content and duration of the training shall be determined by the food service manager. Training shall include sanitation and personal hygiene, food storage and protection, and any other topic significant for food service operations.

        (3) Where a food service manager or supervisor is not present on a shift to provide training, training may consist of a review of other materials as deemed appropriate by the food service manager.

        (4) Records of training shall be retained for at least one year by the food service manager. Training shall be repeated annually for staff subject to regular rotation into dietary operation areas.

    c. Abide by the same standards of personal hygiene as the food service staff.

7. In emergencies, staff may be assigned to food service operation areas without regard to Paragraphs II.F.6.a. and b.

8. The requirements of Paragraphs II.F.5., 6., and 7 shall not apply to contractual food service providers. Contractors shall comply with the terms of the contract.

9. Security staff assigned to posts in food preparation and utensil washing areas shall abide by the same standards of personal hygiene as the food service staff.

Illinois Department of Corrections

| ADMINISTRATIVE DIRECTIVE | Effective 2/1/2001 | Page 4 of 8 | Number 05.02.142 |
|---|---|---|---|

10. The food service manager or food service supervisor in charge shall always accompany the Canine Unit on any inspection of food service operation areas in order to immediately act upon any contamination resulting from such an inspection. If a Canine Unit inspection is conducted at a time when there is no food service manager or food service supervisor on duty, the Duty Administrative Officer or shift supervisor shall accompany the Canine Unit and immediately notify the food service manager or designated food service supervisor in charge to determine decontamination requirements.

11. In case of fire, flood, power outage, or similar event that might result in the contamination of food or that might prevent potentially hazardous food from being held at required temperatures, the food service manager or food service supervisor in charge shall immediately notify the Chief Administrative Officer or the Duty Administrative Officer. If the Chief Administrative Officer or the Duty Administrative Officer:

    a. Determines that there is a need for assistance from the Environmental Health Coordinator or Food Service Administrator to resolve the situation, he or she shall immediately notify one of these individuals. In the event one of these individuals cannot be contacted, the Agency Medical Director shall be contacted via the respective Deputy Director.

    b. Determines that assistance from the Environmental Health Coordinator or Food Service Administrator is not necessary to resolve the situation, he or she shall, as soon as possible during normal working hours, notify the Food Service Administrator and the Environmental Health Coordinator of what has occurred. Normal working hours shall be Monday through Friday, 8:30 a.m. to 5:00 p.m.

12. Upon discovery of a suspected foodborne illness outbreak as identified by the facility=s Medical Director, the Chief Administrative Officer or Duty Administrative Officer shall immediately notify the Agency Medical Director and the respective Deputy Director.

## G. Requirements

The Chief Administrative Officer shall ensure that a written procedure is established for food service sanitation. The written procedure shall require implementation of the provisions in Paragraph II.F. and require that:

1. Deficiencies reported by personnel conducting dietary inspections are corrected. The inspection reports and written records of corrective measures shall be maintained on file by the food service manager for a period of not less than three years.

2. The food service supervisor in charge shall ensure compliance with the following.

    a. Food service staff and inmate workers shall monitor adherence to strict standards of cleanliness and hygiene.

        (1) Staff and inmate workers shall be visually evaluated for boils, infected wounds, or illness on a continuous basis. When there is reasonable cause to suspect possible disease transmission, the food service supervisor in charge shall require that any employee or inmate be cleared by medical personnel or a physician before being permitted to work in

*Illinois Department of* **Corrections**

| ADMINISTRATIVE DIRECTIVE | Effective | Page | Number |
|---|---|---|---|
| | 2/1/2001 | 5 of 8 | 05.02.142 |

food service operation areas.

NOTE: Due to the possibility of disease transmission, no person with diarrhea or who may transmit illness via food shall work in any food service operation area.

(2)    Staff and inmate workers shall have clean hands and fingernails and employ hygienic food-handling techniques.

(3)    All hand washing stations shall be maintained in a clean functioning condition and shall be supplied with soap and electric hand dryers or disposable towels.

(4)    The cleanliness of food service staff and inmate worker outerwear shall be evaluated and maintained. Uniforms that are no longer white shall be brightened or replaced.

(5)    Staff and inmate workers shall wear only clean and effective hair restraints in food service operation areas.

(6)    Staff and inmate workers with hair extending below the nape of the neck shall wear a hairnet or surgical type bonnet.

(7)    Coats and other attire shall not be stored on food service equipment at any time.

b.    The temperature of potentially hazardous foods shall be monitored with a thermometer approved for food service use. The thermometer shall be sanitized before and after each use to assure attainment and maintenance of appropriate cooking and holding temperatures of food.

(1)    All parts of potentially hazardous food shall be cooked in accordance with IDPH guidelines.

(2)    All potentially hazardous food shall be maintained at 40E F. or below, or at 140E F. or above.

(3)    Frozen food shall be stored in freezers operating at 0E F. or below. The re-freezing of uncooked food shall be prohibited.

c.    Refrigerator and freezer temperatures shall be monitored. Refrigerators shall be maintained at an ambient temperature of 40E F. or below. Freezers shall be maintained at an ambient temperature of 0E F. or below.

(1)    Numerically scaled indicating thermometers shall be located in all refrigerators and freezers.

(2)    A log sheet shall be posted and maintained of refrigerator and freezer ambient temperatures. The temperature shall be logged, at a minimum, at the beginning and end of each shift. Each entry shall be initialed by the person making the entry.

**Illinois** Department of **Corrections**

| ADMINISTRATIVE DIRECTIVE | Effective | | Page | | Number | |
|---|---|---|---|---|---|---|
| | | 2/1/2001 | | 6 of 8 | | 05.02.142 |

      (3)    The food service manager shall be notified if temperature recordings of any refrigerator or freezer exceed 45E F. or 10E F., respectively, if for reasons other than unit defrost cycles or food product transfers.

      (4)    The log sheets shall be retained in chronological order for a period of six months in an area identified in the local procedure.

   d.    Manual and mechanical dishwashing operations shall be evaluated at least once during each washing period.

      (1)    The concentration of chemical sanitizing solutions shall be tested with a test kit or chemical test strip with each formulation.

      (2)    The sanitizing effectiveness of the dishwashing machine final rinse temperature shall be verified with a maximum holding or paper thermometer at the beginning of each session of use.

3.    The food service manager shall ensure compliance with the following.

   a.    When sack lunches are prepared, potentially hazardous food items shall be maintained at 40E F. or below.

   b.    Refrigerators and freezers shall be in good repair and maintain ambient temperatures of 40E F. or below and 0E F. or below, respectively. The food service manager shall initial records which indicate refrigerator temperatures above 45E F. and freezer temperatures above 10E F., not due to unit defrost cycles or food product transfers.

   c.    A comprehensive cleaning schedule shall be developed and implemented. The cleaning schedule shall be specific and include each item to be cleaned, when and how it is to be cleaned, and identify by name the individual who is to evaluate cleaning effectiveness.

   d.    Kitchenware and utensils which are cracked, chipped, pitted, dented, or otherwise damaged to a degree that prevents cleaning and sanitization shall be systematically replaced.

   e.    Kitchen equipment shall be repaired or replaced, whenever appropriate.

   f.    The food service manager shall be present in each food serving area, including but not limited to, dining areas, segregation, protective custody, and health care, during the serving of at least one meal a week to evaluate the condition and service of food from the perspective of the consumer. This shall include taking the temperature of the food. In facilities with numerous satellite service sites, this requirement shall not be applicable to security posts and where sack lunches are served.

      (1)    Each week the food service manager shall visit the serving area during the serving of a different meal, breakfast, lunch, or supper, than was evaluated the previous week.

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective | | Page | | Number | |
|---|---|---|---|---|---|---|
| | | 2/1/2001 | | 7 of 8 | | 05.02.142 |

    (2)    A record of visits, findings, and consumer complaints and a record of any action or corrective measures taken shall be maintained.

**NOTE:** The Duty Administrative Officer shall sample food served on the line in accordance with Administrative Directive 01.02.102.

g.    Staff in each food preparation area shall maintain refrigerated samples of at least four-ounce portions of prepared food from each meal for a period of 72 hours after being served. The following shall be exempt from this requirement: packaged foods served without cooking, cookies, bread, and unprocessed raw fruits and vegetables.

    (1)    Each sample shall be dispensed with a utensil that has not been used with other foods.

    (2)    Samples shall be stored physically separate, for example, one food item per tray compartment or container, under refrigeration.

    (3)    Sample containers shall be labeled and dated.

h.    All food shall be served with a suitable dispensing utensil, from a suitable dispensing device, or offered pre-wrapped. Food items that do not lend themselves for dispensing by a utensil may be served by individuals wearing single-use plastic gloves. Food shall not be served by individuals with bare hands.

**NOTE:** Handling of food with suitable utensils shall not be a substitute for proper hand washing. Use of utensils, including deli tissue, spatulas, tongs, or single-use gloves, shall be preceded by thorough hand washing.

i.    An accident prevention program shall be developed and implemented. This program shall include accident prevention, first aid, use of fire extinguishers, correcting unsafe practices, and identifying and correcting hazards in the physical plant and with equipment.

j.    Staff shall adhere to the Food Service Operation Manual outlined in Administrative Directive 05.02.145.

k.    Staff shall adhere to dress requirements contained in Administrative Directive 03.02.110.

l.    Inmate workers shall be supplied with and wear clean, standard white clothing.

m.    Contractors shall comply with the terms of the contract. The requirements of Paragraphs II.G.3.k. and l. shall not apply to contractual food service providers.

n.    The food service manager shall have the authority to remove inmates from a food service assignment.

o.    Food supply protection practices, such as, improperly refrigerated delivered items, worker hygiene, damaged goods or containers, and potential source

*Illinois Department of Corrections*

| ADMINISTRATIVE DIRECTIVE | Effective 2/1/2001 | Page 8 of 8 | Number 05.02.142 |
|---|---|---|---|

contamination, shall be periodically reviewed in consultation with the central supply supervisor.

4.   The central supply supervisor shall ensure:

  a.   Refrigerator and freezer temperatures in central receiving and storage areas are monitored. Refrigerators shall be maintained at an ambient temperature of 40EF. or below. Freezers shall be maintained at an ambient temperature of OEF. or below.

    (1)   A log sheet shall be posted and maintained of refrigerator and freezer ambient temperatures. At a minimum, the temperatures shall be logged at the beginning and end of each attended shift. Each entry shall be initialed by the person making the entry.

    (2)   Maintenance personnel and the food service manager shall immediately be notified upon refrigerator or freezer malfunction or if temperature recordings of any refrigerator or freezer exceed 45EF, and 10EF., respectively, if for reasons other than unit defrost cycles or food product transfers.

  b.   Refrigerated and frozen food and beverage deliveries are moved into appropriate cold storage locations as soon as possible following delivery.

  c.   Food supply protection practices, such as, improperly refrigerated delivered items, worker hygiene, damaged goods or containers, and potential sources of contamination, shall be periodically reviewed in consultation with the food service manager.

**Authorized by:**

Donald N. Snyder Jr.
Director

Supersedes:
05.02.142                    AD                    3/1/1997

STATE OF ILLINOIS )
)
COUNTY OF )

Ex. I

## AFFIDAVIT

I _Am Prentiss Smith_ do hereby declare and affirm that the following information within this affidavit is true and correct in substance and in facts.

I write this AFFiDAViT Because I was at the inmate hospital on Dec. 14/2018 getting my foot soaked when Inmate massey came in To get he's ear flushed Because his ear was ringing with irriationn. The nurse Put water in his ear in flushed the roashes out I saw the Roashes in the cup of water. I was made Because the other nurse that was there (ms. Tina) made a Joke To me, starting (that would Be me in a year with a Reash in my ear) I am writing this AFFiDAViT Because that is not Right having a Roash in your ear in the nurse laugh and Joke about it. if need Be I would speak To any Body about what I saw and heard. Roaches is insanitary Bugs making the conditions of my confinement insanitary.

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury that Everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith.

Signed on this _14_ day of _Dec._ _2018_

_Prentiss Smith 931397_

Affiant