UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| YARII AMEER MASSEY, JR. (R72867), | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:21-CV-00560 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MARCUS HARDY, QUENTIN TANNER, | ) | |
| DAVID GOMEZ, JEREMIGH DALY, | ) | |
| and MAURICE LAKE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Yarii Ameer Massey, Jr., a state prisoner, brings this civil-rights lawsuit asserting that he was housed under unconstitutional conditions of confinement at Stateville Correctional Center, in violation of the Eighth Amendment. R. 57, Second Am. Compl. at 9–10.[1] He sued the prison officials who oversaw Stateville during his incarceration.[2] *Id.* at 17. The Defendants now move for summary judgment, arguing that Massey lacks evidence to support his claims. R. 200, Def.'s Mot. For the reasons discussed in this Opinion, the motion for summary judgment is granted in part—for some Defendants and some prison conditions—and otherwise denied.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]This Court has subject matter jurisdiction over the § 1983 claims under 28 U.S.C. § 1331.

## I. Background

In deciding the County's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, Massey. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Massey was imprisoned at Stateville Correctional Center from December 2016 to September 2022 and was then transferred to Pickneyville, where he is currently incarcerated. R. 218, PSOF ¶ 1; R. 218-3, Massey Dep. at 21:18–19; R. 218-2, Massey Decl. ¶ 2. During his time at Stateville, Massey observed a myriad of unsanitary conditions, including pest infestations, paint chips that fell on him in his sleep, moldy cell walls, and birds coming into his cell through broken windows. PSOF ¶ 2; Massey Dep. at 22:1–13, 66:1–24, 128:18–131:17, 137:19–139:6, 143:12–145:5; Massey Decl. ¶¶ 18–19. Massey also observed a cockroach infestation from his first day in Stateville, which lasted throughout his time there. PSOF ¶¶ 1, 4; Massey Dep. at 126:23–128:6. He learned from another inmate to leave an empty chip bag in the corner at night to confine the roaches there, out of the other areas of the cell. PSOF ¶ 4; Massey Dep. at 126:23–128:6. Between 2019 and 2022, his cell was never sprayed with insect repellant to mitigate the infestation. Massey Decl. ¶ 11. He could not escape by spending time in common areas, because cockroaches ran free in other parts of the cell house, including the galleries, bathrooms, and staff offices. PSOF ¶ 3; Massey Dep. at 131:3–17. Massey also observed rodents in the facility "like every other day," in both his cell and the common areas, including in the dining area. Massey Dep. at 143:12–145:16; Massey Decl. ¶ 17. The mice and rats would leave droppings in and around his bed. *Id.*

Massey once tried to clean up the droppings using a jumpsuit that he had ripped up. *Id.* He also saw birds coming into the cell house and specifically into his cell through a broken window; the birds left droppings on the walls and windows. PSOF ¶ 3; Massey Decl. ¶ 18.

Aside from the pests, paint chips also fell on Massey's head while he slept and ate. PSOF ¶ 2; Massey Dep. at 66:1–9. Given the age of Stateville prison, he assumed that the paint chips contained lead. Massey Dep. at 66:10–15. Massey also saw what he believed to be black mold on the walls of his cell and experienced headaches that he attributed to the mold. PSOF ¶ 2; Massey Dep. at 138:10–139:15. And the showerheads in the facility contained mold as well. PSOF ¶ 3; Massey Dep. at 137:19–139:6. The cleaning supplies made available to Massey were ill-equipped to improve his situation. He was given cleaning chemicals that he believes were diluted, so he had to buy other supplies from the commissary. PSOF ¶ 2; Massey Decl. ¶¶ 13–14. Massey also lacked access to a broom or towel to help him clean. Massey Decl. ¶ 13.

In December 2019, Massey had a medical appointment to address ringing and irritation in his right ear; he was given ear drops as medication. PSOF ¶ 7; R. 218-1, Pl.'s Exh. F at IDOC_000036. Several days later, Stateville nurses examined his right ear and flushed out two dead cockroaches from his ear canal. PSOF ¶ 8; Pl.'s Exh. F at IDOC_000036–37. The next month, Massey failed a hearing screening. PSOF ¶ 12; R. 218-1, Pl.'s Exh. G. Several months later, medical staff confirmed that he had impaired hearing with "moderate to severe [hearing] loss" in his right ear and mild hearing loss in his left ear. PSOF ¶ 23; R. 218-1, Pl.'s Exh. J at IDOC_001111. Before

3

this, Massey had never had hearing loss. Massey Decl. ¶ 23. He was told that he would need a hearing aid for the rest of his life. PSOF ¶ 25; Massey Decl. at ¶¶ 22, 25. The nightmarish memory of having the cockroaches flushed from his ear caused Massey to have trouble sleeping and maintaining an appetite. PSOF ¶ 37; Massey Decl. ¶ 26; R. 218-1, Pl.'s Exh. R at 12.

Massey submitted three grievances challenging the conditions at Stateville, but all of them were denied. His first, in September 2019, complained about the cockroaches, paint chips, mold, and bird droppings in the cell houses and living areas and also complained that Massey was becoming sick with headaches and a runny nose. PSOF ¶ 5; R. 218-1, Pl.'s Exh. B at IDOC_000855. His second, in December 2019, complained about the cockroaches in his ear and the medical complications resulting from that. PSOF ¶ 11; R. 218-1, Pl.'s Exh. F at IDOC_000036. Eventually, several months later, a Stateville counselor responded that the unit was sprayed monthly for cockroaches and that the nurse "d[id] not recall this [cockroach] incident." PSOF ¶ 22; R. 218-1, Pl.'s Exh. A at IDOC_000822. The grievance was formally denied eight months later (in March 2021), and the next month, Defendant David Gomez—the then-Warden of Stateville—signed the denial. Pl.'s Exh. A at IDOC_000822. Massey's third grievance was filed in March 2020 and repeated his complaints about his medical trauma; it also added a complaint about an electrical issue in his cell. PSOF ¶ 16, R. 218-1, Pl.'s Exh. I at IDOC_000027–28. The counselor responded that Massey could move cells after the COVID-19 hold on movement ended, that an exterminator visited the cell to spray for pests, and that a a work order had been issued for the

4

electrical issues. Pl.'s Exh. I at IDOC_000028. The grievance was denied in June 2020, but to Massey's knowledge, an exterminator never came to spray his cell. PSOF ¶¶ 20–21; Pl.'s Exh. I at IDOC_000028; Massey Decl. ¶ 11. In July 2020, Gomez concurred in the denial of the third grievance. Pl.'s Exh. I at IDOC_000028.

Aside from going through the formal grievance process, Massey also remembers speaking with each of the named Defendants about the living conditions when he saw them on walkthrough tours of Stateville. PSOF ¶ 26; Massey Decl. ¶¶ 3–6. He remembers his interactions with Warden Gomez and Maurice Lake (the Shift Commander at the time) most clearly. Massey Decl. ¶ 7. Massey remembers last speaking with Lake about the lead paint, cockroaches, broken windows, and birds in his cell. PSOF ¶ 28; Massey Dep. at 115:14–116:4, 116:21–117:9. He remembers other conversations with Lake during which Massey complained "so many times" because Lake was the person he "s[aw] the most because he walk[ed] around everywhere in the cell houses" regularly. Massey Dep. at 114:13–116:4. Massey also says that he spoke with Gomez in July 2021 for around 30 minutes during a walkthrough, including about the lack of cleaning supplies and Massey's hearing loss from the cockroaches. PSOF ¶ 27; Massey Dep. at 95:8–98:4, 100:24–101:16; Massey Decl. ¶¶ 7–8. Despite these efforts, the living conditions at Stateville did not improve. PSOF ¶ 29; Massey Decl. ¶ 10. So Massey sued the prison officials, alleging that they violated his Eighth Amendment rights by subjecting him to unconstitutional conditions of confinement. Second Am. Compl. at 11–12.

5

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

Section 1983 serves as the primary procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)

(cleaned up).³ To adequately state a § 1983 claim, plaintiffs must allege that they were "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). Here, Massey alleges that the Defendants deprived him of his Eighth Amendment right to be free from cruel and unusual punishment by showing deliberate indifference to the conditions of his confinement at Stateville. Second Am. Compl. at 9–10.

An Eighth Amendment conditions-of-confinement claim requires a showing of (1) a deprivation that is objectively, sufficiently serious such that it denies one of the "minimal civilized measure of life's necessities," and (2) deliberate indifference on the part of prison officials to the conditions causing the deprivation. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Under this framework, officials are deliberately indifferent if they "acted or failed to act despite [their] knowledge of a substantial risk" of harm to inmates. *Id.* at 1008 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Here, the Defendants argue that Massey has failed to satisfy both elements of a conditions claim. R. 202, Defs.' Br. at 7–14.

### A. Living Conditions

Massey claims that the Defendants inflicted cruel and unusual punishment by forcing him to live in unsanitary conditions, which include the cockroach infestation,

---

³This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

mold, lead-paint chips, rodents, bird droppings, and food contamination. R. 217, Pl.'s Resp. at 8–11. The Defendants argue that Massey has not shown how these conditions amounted to a deprivation of an identifiable human need. Defs.'s Br. at 7–12. The Seventh Circuit has held that though "the Constitution does not mandate comfortable prisons, it does mandate humane ones." *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (cleaned up). Living conditions such as "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities," are required to meet the "minimal civilized measure of life's necessities." *Id.* at 719–20 (cleaned up). Massey's complaints about the conditions at Stateville can be separated into two buckets: (1) the myriad sanitation issues; and (2) the specific cockroach infestation that he says caused his hearing loss.

### 1. Lack of Sanitation

Massey asserts that the "woefully inadequate cleaning supplies," mold exposure, bird droppings, food contamination, cockroach and rodent infestations, and lead-paint chips combined to create an inhumane living environment. Pl.'s Resp. at 1, 10. The Defendants argue that Massey fails to identify how this laundry list of sanitation problems amount to a deprivation of a "single human need," and assert that Massey is instead "saying what he would have *liked*, not what he *needed*." R. 225, Defs.' Reply at 6. The Seventh Circuit has recognized that "[s]ome conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so." *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). But the combined conditions must have a "mutually enforcing effect that produces the

8

deprivation of a single, identifiable human need" because "all prison conditions" are not a "seamless web for Eighth Amendment purposes." *Wilson v. Seiter*, 501 U.S. 294, 304–05.

And merely demonstrating an issue of fact on the prison conditions is insufficient: Massey also needs to present evidence that he "suffered some cognizable harm from the overall lack of a sanitary environment." *Gray*, 826 F.3d at 1006. The Court looks for "physical injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (cleaned up). Massey meets this burden for most of the conditions, but not for the mold in the showerheads and the paint chips.

First, Massey presents his deposition testimony to prove up the cockroach and rodent infestations, food contamination, and birds entering his cell through broken windows to leave droppings on his bed railing. Massey Dep. at 128:18–131:17, 143:12–145:5; Massey Decl. ¶¶ 18–19. He also complained of black mold on the walls of his cell. PSOF ¶ 2; Massey Dep. at 138:10–139:15. Plus, Massey offers evidence that he lacked adequate cleaning supplies, such as a broom, towel, or chemicals strong enough to sanitize his cell, to mitigate the filth. Massey Decl. ¶¶ 13–14. These conditions sound in the sort of "myriad infestations and [] lack of access to adequate cleaning supplies," capable of depriving Massey of "the basic human need of rudimentary sanitation in violation of the Eighth Amendment." *Gray*, 826 F.3d at 1005. Like the prisoner in *Gray*, Massey also asserts that the broken windows in the cell house

9

exacerbated his situation because birds treated the prison's interior like the outdoors, including by leaving droppings. Massey Decl. ¶ 18. And unlike the plaintiff in *Sain v. Wood*, Massey presents evidence that the roach infestation rose well beyond only seeing "several roaches at a time in his cell, which was treated by an exterminator every six weeks or so and additionally on request." *Gray*, 826 F.3d at 1005 (citing *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008)). Instead, Massey testified that he sometimes saw what he estimated to be hundreds, if not a thousand, roaches at a time. Massey Dep. at 127:14–20. And to his knowledge, his cell was never sprayed for pests during the time he was imprisoned at Stateville. Massey Dep. at 143:12–145:5; Massey Decl. ¶ 11. The unsanitary conditions also contributed to potential food contamination in the kitchen area, which had "[l]ots of insects/rodents, mice & birds." R. 218-1, Pl.'s Exh. H; *see also* Massey Dep. at 143:13–15 (describing rodents in the dining hall and kitchen). These conditions, either on their own or combined with a mutually enforcing effect, are enough for a reasonable jury to find that Massey was deprived of the basic human need for sanitation.

Massey also presents enough evidence that these conditions had an adverse effect on his health. Aside from his loss of hearing—discussed in the next section—he complained of trouble sleeping, loss of appetite, headaches, depression, and increased anxiety. PSOF ¶¶ 5, 37; Massey Decl. ¶ 26; 12; Pl.'s Exh. B at IDOC_000855; Pl.'s Exh. R at 12. A reasonable jury could find that enduring day-after-day, month-after-month of pest infestations, birds (and their droppings), mold in his cell, and lack of

10

cleaning supplies—combined or standalone—deprived Massey of basic human sanitation needs and caused him those injuries.

But two of the living conditions are not supported by enough evidence. Massey asserts that the showerheads "were filled with mold" and that he was exposed to lead paint daily when he ate and slept. Pl.'s Resp. at 10; PSOF ¶ 3; Massey Dep. at 66:1–24, 137:19–139:6. On the paint chips, although it was no doubt troubling to have paint chips fall on Massey's head during meals and sleeping, there is not enough evidentiary support for the assertion that the paint had lead in it or that the paint caused him harm. Massey argues that he "inferred" the presence of lead in the paint because of his "[u]nderstanding that Stateville was built over one century ago." Pl.'s Resp. at 3. But that is insufficient speculation at this summary judgment stage. The record contains no testimony, declarations, or interrogatory answers to establish that Stateville does in fact have lead-based paint, or that the paint chips that fell on Massey contained lead. With regard to the mold in the showers: Massey does not adequately connect this to an injury or otherwise establish that it was sufficiently severe to constitute a deprivation of a human need. Though he testified that the mold in the *cell* caused his headaches and a runny nose (and filed a grievance asserting the same), he does not provide concrete evidence that the mold in the *showerheads* caused him harm. So Massey cannot rely on the mold in the showers and the lead-based paint chips to advance the conditions claim.

### 2. Cockroach Infestation

According to Massey, the cockroach infestation demonstrates the "most extreme form" of his unsanitary living conditions at Stateville. Pl.'s Resp. at 8. The Defendants argue that Massey fails to provide evidence linking his hearing loss to the cockroach infestation, and the defense posits instead that Massey's listening to loud music through earphones is a possible cause for the injury. Defs.' Br. at 9–10. They also argue that infestations in prisons are "not serious if [they] do not pose a substantial risk of serious harm." *Id.* at 8. The Defendants are wrong: Massey has provided evidence allowing a reasonable jury to find that the cockroaches in his ear caused his hearing loss.

The Seventh Circuit has recognized that pest infestations may rise to the level of an Eighth Amendment deprivation when they are "prolonged" and sufficiently severe. *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996). Specifically, where the cockroaches are "everywhere, crawling on [an inmate's] body … and constantly awakening him," an infestation may seriously impact one's health. *Id.* (cleaned up). Massey provides enough evidence that the Stateville cockroach infestation he endured rises to a level nearly on par with that of the infestation in *Antonelli*. The Stateville infestation persisted throughout the nearly six years that Massey was imprisoned there; he saw hundreds of roaches at a time; they crawled onto—and inside of—his body; and he now suffers from hearing loss and trouble sleeping. PSOF ¶¶ 1, 3–4, 8, 25; Massey Dep. at 126:23–128:6; 131:3–17; Massey Decl. at ¶¶ 22, 25; Pl.'s Exh. F at IDOC_000036–37.

The Defendants' specific contention that Massey must provide a medical expert to opine on the cause of his hearing loss misses the mark. It is true that some injuries would require expert evidence to make a causal connection. But at the summary judgment stage, Massey is entitled to the benefit of reasonable inferences, and the circumstantial evidence that he offers is enough. He avers under oath that he had no hearing loss before the two dead roaches were flushed from his ear—and then just one month or so after that, he failed medical-staff administered hearing tests. *See* Pl.'s Exh. E; Pl.'s Exh. G; Massey Decl. at ¶¶ 22, 25. And it is not as if the defense offered expert evidence that casts doubt on the common-sense notion that two cockroaches can cause damage to a person's ear and hearing ability. Indeed, the two cockroaches were inside the ear so long that they eventually died. And they were so deep inside the ear that medical staff had to flush out them out. Viewing the evidence in the light most favorable to Massey, a reasonable jury could conclude that the cockroaches caused the hearing loss.

### B. Deliberate Indifference

Next, Massey argues that the Defendants were deliberately indifferent to the prison conditions, that is, they had personal knowledge of the conditions through their roles and conversations with Massey yet disregarded the serious risk of harm. Pl.'s Resp. at 11–15. The Defendants argue that they did not know about the conditions and cannot be held liable merely for their supervisory roles. Defs.' Br. at 3–7. To be sure, the Defendants are right up to a point: Section 1983 does not allow for *respondeat superior* liability. To survive summary judgment, Massey must offer

enough evidence to show that each Defendant personally "kn[ew] of and disregarded an excessive risk to inmate health or safety." *Gray*, 826 F.3d at 1008 (cleaned up); *see also Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). But this standard can be satisfied with a showing that prison officials are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and also "dr[ew] the inference." *Farmer*, 511 U.S. at 837. Massey need not prove that each Defendant chose their actions with the intent that inmates would actually be harmed—it is enough if they simply knew of the substantial risk to inmate safety and disregarded it. *See Silva v. Pfister*, 2021 WL 1103483, at *6 (N.D. Ill. Mar. 23, 2021). Finally, where a conditions claim targets pest infestations and generally unsanitary conditions, "the risk of both physical and psychological harm is obvious—children are taught the importance of washing their hands before kindergarten, and the repulsive nature of cockroaches and mice is hardly subject to dispute." *Gray,* 826 F.3d at 1009. As explained next, Massey meets this subjective-awareness burden for Gomez and Lake, but falls short for the other Defendants.

### 1. Warden Gomez

David Gomez—the Stateville Warden at the time when Massey was there—denies having personal knowledge of the conditions or discussing them with Massey. *See* R. 201-2, Gomez Decl. ¶¶ 7–9, 13, 15, 23. Massey responds that he personally spoke with Gomez multiple times about the conditions, the most recent conversation taking place in summer 2021 during one of Gomez's walkthrough tours of the cell house. Massey Dep. at 95:8–100:22; Massey Decl. ¶¶ 7–8. Massey maintains that he

told Gomez about the medical issues caused by the cockroach infestation and the lack of cleaning supplies. Massey Dep. 95:8–100:22. Massey also remembers that Gomez took notes during their conversations and told Massey that Gomez would "stand on it," implying that he would address the conditions. Massey Dep. at 97:19–98:4. Also, Gomez personally signed Massey's second and third grievances, which described the cockroach and rat infestations, as well as the hearing loss. Pl.'s Exh. A at IDOC_000822; Pl.'s Exh. I at IDOC_000027–28.

Based on this combined evidence, a reasonable jury could find that Gomez had personal knowledge of Massey's living conditions. Massey avers that he outright told Gomez (as recently as Summer 2021) about the conditions, and Massey must be credited at the summary judgment stage. Add to that the signed second and third grievances, which Gomez presumably read before signing. *See Silva*, 2021 WL 1103483, at \*7 (explaining that signed grievances can serve as evidence of a Warden's personal knowledge). The circumstantial evidence also includes the very nature of the conditions claim here—prison-wide problems. "[W]here the evidence demonstrates a systemic problem, senior officials like the Warden of Stateville … could be expected to have personal responsibility for resolving the situation." *Id*. (citing *Antonelli*, 81 F.3d at 1428–29). Massey has enough evidence that Gomez was aware of the conditions.

### 2. Shift Commander Lake

Maurice Lake—the then-Shift Commander—also denies having personal knowledge of the conditions or discussing them directly with Massey. *See* R. 201-5, Lake Decl. ¶¶ 3, 6–8, 12. From September 2019 through March 2020, Lake was

15

"personally responsible for making rounds of e-house, daily." Lake Decl. ¶ 5. Massey remembers discussing his living conditions with Lake during a walkthrough of the cell house. Massey Decl. ¶ 7, 9. Massey also testified that he "complained to Lake so many times" during Lake's walkthroughs and that Lake was the official that he encountered the most. Massey Dep. at 114:13–115:24.

Like with Gomez, a reasonable jury could find that Lake knew of the deplorable conditions. Lake admits that he was tasked with daily rounds of E-House during at least part of the time that Massey lived there, Lake Decl. ¶ 5, including when Massey suffered injuries that he attributes to the infestations and mold. Pl.'s Exh. F at IDOC_000036–38 (Massey's first grievance filed when assigned to E-House). This alone could lead a factfinder to conclude that Lake was aware of the "obvious" harm in plainly observable sanitation problems, especially considering the "repulsive nature of cockroaches." *Gray*, 826 F.3d at 1009. Massey's testimony about the conversations with Lake during the walkthroughs must be credited at this stage. There is enough evidence to find that Lake knew about the conditions.

### 3. Hardy, Tanner, and Daly

The remaining Defendants are IDOC Deputy Director Marcus Hardy, Head Dietary Program Manager Quentin Tanner, and Chief Stationary Engineer Daly. They all assert that they did not know about Massey's living conditions at Stateville. Defs.' Br. at 12–13. Massey contends that he "spoke with each Defendant about [his] living conditions," and is "confident that [he] spoke with each Defendant during a walkthrough," though he lacks "an exact memory of each instance." Massey Decl. ¶ 6.

In contrast to Gomez and Lake, Massey has not created a triable issue of fact that these three other Defendants knew about the conditions.

Hardy served as the Deputy Director of IDOC's Northern Region. R. 201-1, Hardy Decl. ¶ 2(j). Hardy disclaims any personal knowledge about Massey's living conditions. *Id.* ¶ 6. He also maintains that any complaints about those conditions would have been passed to the Warden (that is, Gomez) for follow-up. *Id.* In response, Massey can offer only a vague assertion about how he told Hardy about the conditions. At most, Massey testified that the conversations with the Deputy Director would "probably be" during Hardy's tours of the cell house, and that the "last time [he] had a tour with Hardy it was probably … possibly 2021." Massey Dep. 103:12–20. Massey acknowledged that he does not "remember the exact dates," and says that he "sp[oke] to him verbally," "only like two times." *Id.* at 103:19–106:14. It is one thing to not remember exact dates—there is no need to be that precise to lay a foundation for conversations of this type. But Massey's descriptions of the conversations are so vague that foundation is lacking. If Massey were to testify at this level of vagueness at trial, an objection for lack of foundation would be sustained. Massey can bracket the conversations only to some point within *one entire year* around 2021. And Massey is too vague on which conditions he told Hardy about. Massey mentions birds and roaches but then testified that he thinks it was "anything that's in [his] complaint." *Id.* at 107:11–22. Foundation for the conversations falls short, and the evidence is too speculative for a jury to find that Hardy knew about the conditions.

Quentin Tanner was the Head Dietary Program Manager. R. 201-3, Tanner Decl. ¶ 3. His responsibilities include overseeing the ordering of food, budgeting for food, and food services generally. *Id.* ¶ 4. Tanner avers that he did not know about any bird, roach, or rodent infestation in Massey's cell house during the relevant time, and that in any event, he had no responsibility, as the Head Dietary Program Manager, to address those conditions. *Id.* ¶ 14. He also states that he did not know about any food contamination during the relevant time. *Id.* ¶ 15. Again, Massey offers insufficient foundation for the purported conversation during which he supposedly told Tanner about food contamination. Massey testified that there were "birds in [Tanner's] kitchen," and Tanner "literally [saw] this," yet chose to do nothing. Massey Dep. at 108:23–109:20. But Massey does not explain how he knew (either directly or via circumstantial evidence) that Tanner saw that there were birds in the kitchen. Massey also swears that he has "definitely spoken to [Tanner]," during Tanner's tours of the chow hall, "probably one time, if any," sometime in early 2020. *Id.* at 110:16–113:5. And during this conversation, Tanner told Massey that he was "doing the best he can," but nothing changed as a result. *Id.* at 113:10–24. But the foundation for Massey's memory of the conversation boils down to "probably one time, if any." *Id.* at 112:17–18. This is too vague to create a triable issue of fact on Tanner's knowledge. And because the food-contamination claim requires personal participation from the

18

Defendants—and Tanner is the only food-services Defendant in the suit—this condition also does not survive summary judgment as a basis for liability.[4]

Lastly, Jeremiah Daly was the Chief Stationary Engineer of Stateville. R. 201-4, Daly Decl. ¶ 2. He was responsible for the operation of the physical plant at Stateville, but not for fixing electrical or ventilation issues. *Id.* at ¶¶ 3, 5. Daly swears that he did not know about mold problems in Massey's cell house during the relevant period, though Daly admits that he is *generally* aware of complaints about birds, rodents, and roaches. *Id.* ¶¶ 18–19. Daly disclaims, though, ever speaking to Massey about the specific problems presented by Massey. *Id.* ¶ 20. That is not surprising because even Massey testified that he did not "remember offhand" whether he had spoken to Daly, but that he thinks he wrote to Daly about his issues. Massey Dep. 88:5–22. Massey also concedes that he "probably had … like not that many real interactions" with Daly. *Id.* 85:11–17. Even giving Massey the benefit of reasonable inferences, this evidence is not enough for a jury to find that Daly knew about the conditions. Daly too is entitled to summary judgment.

## IV. Conclusion

The Defendants' motion for summary judgment, R. 200, is granted in part and denied in part. Massey's conditions-of-confinement claim on the (1) in-cell mold; (2) cockroach infestation (including hearing loss); (3) bird infestation (including bird

---

[4]The other four Defendants would not have been responsible for discovering or remedying any food contamination at Stateville. *See* Hardy Decl. ¶ 23; Gomez Decl. ¶ 21; Daly Decl. ¶ 22; Lake Decl. ¶ 7.

droppings); (4) rodent infestation; and (5) lack of adequate cleaning supplies survives as to Warden Gomez and Shift Commander Lake. The Defendants' motion for summary judgment is granted as to the remaining defendants (Hardy, Daly, and Tanner) and the remaining conditions (in-shower mold, lead-based paint, and food contamination). With this decision in place, the parties shall start settlement negotiations and file a status report by April 18, 2025, including whether they want a settlement referral to the magistrate judge.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2025